IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

DIANA MEY, on behalf of herself
and a class of others similarly situated,

      Plaintiff,

                                    Civil Action No. 5:21-cv-00062

v.


MATRIX WARRANTY SOLUTIONS,
INC., et al.

      Defendants.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Matrix Warranty Solutions and Matrix Financial Services (collectively, "Matrix") sell and administer vehicle service contracts. In this class action, Plaintiff Diana Mey ("Mey") alleges that Matrix—through one of its telemarketing vendors, National Auto Protection Corp. ("NAPC")—knowingly engaged in a pattern and practice of flooding consumer phones with illegal prerecorded messages in violation of the Telephone Consumer Protection Act ("TCPA"). ECF No. 1. Now Mey seeks to certify a class of individuals who—like her—received illegal prerecorded calls.

This case involves conduct much more harmful to consumers than in many TCPA cases. Often, TCPA defendants handwave the injuries they cause, arguing that the only "real" harm they've caused is a ringing phone. Not the case here. This proposed class is comprised of individuals who—in addition to receiving illegal calls—were actually duped into purchasing auto warranties of questionable value. This

class will therefore shine light on the concrete financial harms caused by widespread, illicit telemarketing campaigns.  The class should be certified.

### I.  OPERATIVE FACTS

#### A.  The April 2017 Call to Mey

On April 27, 2017, Mey received a call from 682-267-1875.  *See* Exhibit 1 (Decl. of Diana Mey).  When Mey answered the call, a prerecorded message was played.  *See* Exhibit 2 (.mp3 recording).  After a series of automated prompts, Mey was forwarded to a live agent who then solicited a vehicle service contract.  *See id*.  When asked, the telemarketing agent represented that she worked for NAPC.  *Id.* at 10:40.  To further confirm the origins of the offending call, Mey purchased the vehicle service contract and authorized the live agent to charge her credit card.  *Id*.  Mey made an initial payment to enroll the vehicle, with the remainder of the premium broken into periodic payments.  *Id*. at 7:30.  The terms of the payment plan were provided and agreed to over the phone.  *Id*.  Having confirmed the purchase and the financing, the phone call ended.  *Id*.

#### B.  The Welcome Email

Following that call, Mey's credit card was charged by "National Auto Protection."  *See* Exhibit 3 (Statement Excerpt).  Mey also received a welcome email from Meredith Ball (custsvc@nationalautoprotectioncorp.com) of NAPC, confirming the purchase of an "Element EP" vehicle service contract.  *See* Exhibit 4 (Email). Because it typically takes five business days to mail out physical copies of the vehicle service contract, Exhibit 2 at 8:30, the NAPC representative provided Mey with a

hyperlink, which allowed Mey to view the terms and conditions of her new vehicle service contract.  *See* Exhibit 4.  A copy of the linked "specimen" policy is attached as Exhibit 5.

### C.  The Matrix Policy

The policy Mey received was stamped with a Matrix logo and called the "Element EP" protection plan, which Matrix has confirmed is a Matrix product. *See* Exhibit 6 (Tr. at 89:24-90:2).  Among other instructions, policy holders were directed to "report the repairs to the **Administrator** at **1-855-500-MATRIX (6287)**," and the bottom of each page was stamped with the following instruction:

> **AUTHORIZATION MUST BE OBTAINED FROM THE ADMINISTRATOR BEFORE STARTING ANY TEARDOWN OR REPAIRS.**
> **PLEASE CALL 1-855-500-MATRIX (6287) FOR AUTHORIZATION AND INSTRUCTIONS.**

Exhibit 5.

At the time of the offending calls, Matrix was responsible for creating, hosting, and administering the automated menu associated with the above phone number. *See* Exhibit 6 (Tr. at 72:16-19, 73:5-24).  This is the same phone number that currently appears at the top of Matrix's webpage.[1]

### D.  The Policy Cancellation

Having identified the source of the April 27, 2017 call, Mey cancelled the vehicle service contract later that same day.  *See* Exhibit 1.  As a result of the quick cancellation, she did not receive a physical copy of the vehicle service contract in the

---

[1] *See* https://www.matrixprotection.com/ (last visited February 21, 2023).

mail.  *See* Exhibit 2 at 8:30 (live agent representing that it typically takes 5 business days to mail out physical copies of the vehicle service contract).  On April 29, 2017, Mey's credit card was refunded by "NATNL AUTO PRTECT CORP."  *See* Exhibit 3. The cancellation and refund were confirmed via email from Debyi Adams, a customer service manager with NAPC.  *See* Exhibit 7.

### E. Matrix and NAPC's Relationship[2]

At the time of the call, NAPC was a "licensed call center" and "authorized sales representative" of Matrix.  *See* Exhibit 8 (Agreement).  The parties' relationship was governed by a Direct Marketing Producer Agreement, dated June 2016, which authorized NAPC to offer and sell Matrix vehicle protection plans, one of which was the "Element EP" plan sold to Mey in April 2017.  *Compare* Exhibit 4 (Email) *with* Exhibit 9 at 4-5 (Discovery Response).

## II.  THE PROPOSED CLASS

Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), Mey moves to certify the following class:

> Prerecord Class.  Plaintiff and all persons appearing on the Customer Lists (a) to whom NAPC sold a Matrix-administered, -created, or -branded product; (b) by initiating a telephone call to a residential and/or cellular telephone number; (c) using artificial or prerecorded voice messages; and (d) at any time four years before the date

---

[2] Though it eventually brought these functions in-house, Matrix outsourced a subset of administrative functions to a third party, SouthwestRe, for a brief period of time.  The nuances of those three relationships (NAPC, Matrix, SouthwestRe) do not bear on class certification and are thus beyond the scope of this motion.  Should Matrix file a motion for summary judgment—challenging, among other things, vicarious liability—Mey will explain those relationships in greater detail at that time.

this action was commenced through the date of class certification.

In her Complaint, Mey also alleges that Defendants violated the TCPA by placing calls to Mey's residential telephone number, which was listed on the National Do Not Call Registry. *See* ECF No. 1. Mey, however, does not seek to certify a class based on these DNC violations.

## III.   SUMMARY OF CLASS THEORY AND CLASS RECORDS

Often, TCPA classes are defined by reference to call records. Unfortunately, TCPA defendants have learned that they can often avoid liability by leaving records in the hands of fly-by-night marketers whose records are just as ephemeral. That's what happened here. NAPC has dissolved, and its records have vanished along with it. Fortunately, through extensive investigation and third-party discovery, Mey has been able to define her class through other means. Mey relies on three types of evidence common to the class as a whole, which, together, prove the receipt of inbound prerecorded messages from NAPC.

*The Customer List*

Mey has identified each individual who purchased a Matrix vehicle service contract from NAPC during the relevant class period, April 24, 2017 to present.[3] Customer List 1, which is attached as Exhibit 10, represents all customers who purchased a Matrix vehicle service contract from NAPC during the period April 2017

---

[3] This aspect of the class definition means the members of this class have suffered a harm greater than most. Whereas class defendants often handwave TCPA class injuries as "nominal," this class is comprised of individuals that were actually duped into purchasing auto warranties of questionable value.

to August 31, 2017.  Customer List 2, which is attached as Exhibit 11, represents all customers who purchased a Matrix vehicle service contract from NAPC during the period August 31, 2017 through present.  Customer Lists 1 and 2 are collectively referred to as the "Customer List," which identifies by name, address, and phone number each of the approximately 10,375 individuals who—like Mey—purchased a Matrix product from NAPC during the class period.  So, from that Customer List, how does Mey prove that each customer received a phone call from NAPC?

*The Payment Plan Agreements*

Because the vehicle service contracts are generally financed over the life of the policy, nearly all of the individuals on the Customer List executed a Payment Plan Agreement.  Similar to the below example, each Payment Plan Agreement contains a notation from the NAPC representative indicating that the customer provided their assent "per phone" and indicating the date of the call.



> **BY SIGNING BELOW OR BY MAKING YOUR FIRST PAYMENT AFTER YOU HAVE RECEIVED A MAILED OR ELECTRONIC COPY OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION BELOW, AND YOU AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT.**
>
> | BUYER | | SELLER | |
> |---|---|---|---|
> | X  *PER PHONE*           04/28/2017 | | By: X *Meredith Ball*        04/28/2017 | |
> | Signature                    Date | | Signature                    Date | |

*See* Exhibit 12.[4]

---

[4] This excerpt is taken from the Payment Plan Agreement of Madison Baily, a resident of Parkersburg, West Virginia and prospective class member.  Notably, Ms. Baily was sold a Matrix vehicle service contract by Meredith Ball, the same NAPC representative that sold Mey a Matrix vehicle service contract just a day earlier.  *Compare* Exhibit 12 *with* Exhibit 4.

Mey is in possession of Payment Plan Agreements for nearly all of the 10,375 prospective class members.[5]  Notably, in each instance, the date of the call coincides with the date of the purchase, both of which are reflected on the Customer List and the corresponding Payment Plan Agreement.  By matching each customer on the Customer List to a corresponding Payment Plan Agreement, Mey can demonstrate that each customer received a phone call from NAPC, as evidenced by the "per phone" notation.  So, having demonstrated that approximately 10,375 individuals received calls from NAPC, how does Mey intend to prove that NAPC used prerecorded messages across the class?

*The Class Declarations*

The prerecorded calls that Mey received, as well as her subsequent purchase and interactions with Matrix and its agents, are well documented.  Given that prerecorded marketing calls are delivered en masse, a jury can reasonably infer that a class of similarly situated customers—who purchased the same product during the same period from the same telemarketer—received the same prerecorded message from NAPC in conjunction with their purchase.  This inference—that NAPC used prerecorded messages across the entire class—is further bolstered by sworn statements Mey has obtained from prospective class members who recall receiving a prerecorded message in conjunction with the purchase of their Matrix policy.  *See*

---

[5] As discussed below, there are a *de minimis* number of customers on the Customer List without a Payment Plan Agreement.  Plaintiffs' expert, Ms. Verkhovskaya, has identified an administratively feasible way to identify those individuals so they can be removed from the class.

Exhibit 13 (Decl. of Jade Warren); Exhibit 14 (Decl. of Dan Lawshe); Exhibit 15 (Decl. of Kenneth Bean); Exhibit 16 (Decl. of Joseph Burker); Exhibit 17 (Decl. of C. Shanahan).[6]

Any fact of consequence can be proven through circumstantial evidence. Classwide inferences are no different. *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089 (10th Cir. 2014) (permitting classwide inferences based on circumstantial evidence generally applicable to the class as a whole); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 89 (2d Cir. 2015) ("[I]t may be possible in certain circumstances for a putative class to prove causation on a class-wide basis by offering sufficient circumstantial proof to permit the reasonable inference that the third parties in question must have relied on the defendant's misrepresentation.") (cleaned up).

## IV.   RULE 23(A) REQUIREMENTS

In order to certify a class, a plaintiff must satisfy two sets of requirements: those set forth in Rule 23(a) and, in this case, those set forth in Rule 23(b)(3). *See* Fed. R. Civ. P. 23.

---

[6] Ms. Shanahan settled a nearly identical lawsuit against Matrix, alleging that NAPC placed unsolicited telemarketing calls on Matrix's behalf using prerecorded messages. *See Shanahan v. Matrix Warranty Solutions, et al.*, No. 1:19-cv-3788 (N.D. Ill.). Though the settlement necessarily precludes Ms. Shanahan from recovering as a putative class member, her testimony can still be used to prove that NAPC sent unsolicited prerecorded messages to consumers on Matrix's behalf.

## A.   Ascertainability

Though not expressly enumerated, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) (cleaned up).  Under this so-called "ascertainability" principle, "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.*  Importantly, this implicit threshold requirement does not require that each class member be identified at the time of certification.  *Id.* at 658.  Rather, Rule 23 merely requires that the class be defined "in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point." *Id.*

Absent class members will be identified using two pieces of common, classwide evidence: the Customer List and the Payment Plan Agreements.  The Customer List serves as the starting point for identifying absent class members.  The Customer List identifies by name, address, and phone number approximately 10,376 individuals that—like Mey—purchased a Matrix product from NAPC during the class period.  From the Customer List, the class will be further refined to include only those customers that received a phone call from NAPC, as evidenced by the "per phone" notations in the corresponding Payment Plan Agreements.  If a customer did not execute a Payment Plan Agreement, then that individual will be excluded from the

class.[7]  What is left are absent class members (identified by name, address, and phone number) to whom NAPC sold a Matrix product during the class period and for whom there is a corresponding Payment Plan Agreement evidencing a call from NAPC.[8]

Mey's expert, Ms. Verkhovskaya, has provided an administratively feasible method for applying this comparison and identifying members of this proposed class at scale.  *See* Exhibit 18.  Using .SQL staging tables and a series of commands and queries, Ms. Verkhovskaya has explained how she will translate data from the Customer List into common fields and codes—a process called "data mapping."  *Id*. at 14.  Once the data from the Customer List is properly mapped, it will be loaded into a Sequel master table for further hygiene and standardization.[9]  *Id*.  Because the Payment Plan Agreements have been produced in a searchable .pdf format, Ms. Verkhovskaya can search and programmatically extract the following data points from the "Buyer" sections of the Payment Plan Agreements: contract number, contract date, name, address, phone, and the "per phone" designation from the signature line.  *Id*. at 15.  Ms. Verkhovskaya will then cross-compare the data from

---

[7] There are a *de minimis* number of customers on the Customer List without a Payment Plan Agreement.  For example, Customer List 1 contains approximately 2,048 qualifying customers.  Yet, only 24 of those customers (1%) are without a corresponding Payment Plan Agreement.

[8] That each of these calls included a prerecorded message will be proven through common, classwide inferences applied across the entirety of the class, as discussed below. *See infra*, V.A. Predominance.  And because these inferences will be applied across the entire class, this step has no bearing on "ascertainability."

[9] For example, Ms. Verkhovskaya will filter out from further analysis records with telephone calls to telephone numbers with toll-free prefixes (e.g., "800," "833," "844," "855," "866," "877," and "888"), records with telephone calls to U.S. government telephone numbers with prefix "710," and records with telephone calls to premium paid service telephone numbers with prefix "900."

the Customer List and the Payment Plan Agreements in order to identify which individuals on the Customer List are party to a Payment Plan Agreement with a "per phone" notations. *Id*. at 16. By performing this comparison, Ms. Verkhovskaya is able to identify at scale those individuals who received a telephone call from NAPC, as evidenced by the "per phone" notation in the corresponding Payment Plan Agreement. *Id*. To ensure accuracy, Ms. Verkhovskaya will cross-compare other data fields such as name, address, phone number, and contract number to ensure a proper match between each individual customer and their corresponding Payment Plan Agreement. *Id*. at 16-17.

Given that there is an objective and administratively feasible method for identifying absent class members, the ascertainability requirement is satisfied.

## B.   Numerosity

The first enumerated requirement of Rule 23(a) is that the class must be of such a size that joinder of all members is impracticable. *Vance v. DirecTV, LLC*, No. 5:17-CV-179, 2022 WL 3044653, at *6 (N.D.W. Va. Aug. 1, 2022) (Bailey, J.). Because there is no bright line test for determining numerosity, the determination rests on this Court's practical judgment in light of the particular facts of the case. *Id*. "The class representatives are not required to specify the exact number of persons in the proposed class." *Id*. As evidenced by the Customer List, the proposed class contains approximately 10,376 persons residing throughout the United States. Because joinder of approximately 10,376 class members residing throughout the United States would be impracticable, the numerosity requirement is satisfied.

### C.   Commonality

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This is a low hurdle.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).  The class claims must "depend upon a common contention capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up).  "What matters to class certification is . . . the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*.  Commonality requires only a single issue common to the class.  *Id*. at 359.

Here, each putative class member suffered the same injury: they all received a prerecorded telephone call by or on behalf of Defendants in contravention of the TCPA.  The common questions of law and fact include: (i) whether NAPC made unsolicited calls using artificial or prerecorded messages; (ii) whether the violations were willful or negligent; and (iii) whether Defendants are vicariously liable for calls placed by NAPC.  *See Mey v. Venture Data, LLC*, No. 5:14-CV-123, 2017 WL 10398569, at *8 (N.D.W. Va. June 6, 2017) (identifying similar common issues).  These common questions are dispositive to the class claims, apply equally to all class members, and can be resolved using uniform proof and legal analysis.  *See infra*, V. A. PREDOMINANCE.  Because there are questions of law or fact that are common to all members of the proposed class, the commonality requirement is satisfied.

### D.   Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "A sufficient nexus is established to show typicality if the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory."  *Vance*, 2022 WL 3044653, at *6 (cleaned up).  "A plaintiff's claim may differ factually and still be typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. So long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied."  *Id.* at *7 (cleaned up).

Mey and the putative class members suffered the same injury: they all received a prerecorded message by or on behalf of Defendants in contravention of the TCPA. This common injury arises from the same practice and course of conduct: Matrix outsourced its telemarketing operations to NAPC, which proceeded to call Mey and each of the putative class members in contravention of the TCPA.  As such, Mey and the putative class members seek the same statutory relief based on the same statutory claim.  Consistent with the underlying purpose of "typicality," Mey's interests are perfectly aligned with those of the class.

Matrix will likely complain that Mey is not listed on the Customer List.  First, this is of no surprise.  As evidenced by the Direct Marketing Producer Agreement between Matrix and NAPC, NAPC is required to submit month-end reports to Matrix

identifying ever vehicle service contract sold during the month. *See* Exhibit 8 at ¶ 2. Because Mey purchased and cancelled her policy on April 27, it follows that she would not be included in NAPC's month-end report, which is due within 10 days after the end each calendar month. *See id*. When asked if this explanation was plausible, Matrix's corporate representative acknowledged that, "It's possible, yes." *See* Exhibit 6 (Tr. 88:6-12). Second, whether Mey is listed on the Customer List is of no consequence. The Customer List simply assists in identifying by name, address, and phone number other customers that purchased a Matrix product from NAPC during the class period. The prerecorded call that Mey received, as well as her subsequent purchase and interactions with NAPC, are well documented. *See supra*, I. OPERATIVE FACTS. There can be no genuine dispute that Mey purchased the same product during the same period from the same telemarketer. There are no meaningful differences between Mey's claims and those of the class.

### E.   Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This determination requires a two-pronged inquiry: (1) the named plaintiff must not have interests antagonistic to those of the class; and (2) the named plaintiff's attorneys must be qualified, experienced and generally able to conduct the litigation. *Vance*, 2022 WL 3044653, at *7.

As to the first inquiry, Mey's interests do not conflict with those of other class members. Rather, all seek a determination that Defendants, through their agent

NAPC, violated the TCPA, and all seek the same remedy. By investigating, filing, and vigorously prosecuting this case, Mey has demonstrated a desire and ability to protect the interests of absent class members. Indeed, Mey has—to great success—vigorously prosecuted numerous other class cases in this district. When asked to pass on the adequacy of Mey's representation, this Court has repeatedly acknowledged her commitment to prosecuting class claims and her willingness the place the interests of the class above her own. *See Venture Data*, 2017 WL 10398569, at *8 (collecting cases). This case is no different.

Just as Mey is committed to the prosecution of this case, so too are her lawyers, who have requested appointment as class counsel. Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. As evidenced by the declaration attached as Exhibit 19, Mey's counsel has substantial experience litigating TCPA and other consumer class actions in state and federal courts and has worked diligently to prosecute the class claims in this case. Because both Mey and her counsel are committed to the prosecution of this case and because there are no conflicts that would otherwise hinder their representation, the adequacy requirement is satisfied.

## V.   RULE 23(B)(3) REQUIREMENTS

### A.   Predominance

"The first factor under Rule 23(b)(3) requires that the questions of law or fact common to all class members predominate over questions pertaining to individual members." *Vance*, 2022 WL 3044653, at *7. The predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy. *See Newberg on Class Actions* § 4.25. The predominance requirement necessarily focuses on the quality of common issues rather than just the quantity. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir.2003).

This case presents two dispositive, overarching questions: (i) whether NAPC called each of the class members using prerecorded messages; and (ii) whether Defendants are vicariously liable for calls placed by NAPC. Each of these questions can be answered through common, classwide evidence without the need for extensive and individualized fact finding.

First, using common classwide evidence, Mey can prove that NAPC placed calls to each class member. Because vehicle service contracts are generally financed over the life of the policy, nearly all of the customers on the Customer Lists executed a Payment Plan Agreement. Each of these Payment Plan Agreements were authorized over the phone and therefore contain a notation from the NAPC representative

indicating that the customer provided their assent "per phone" and indicating the date of the call.  Each of the Payment Plan Agreements appear in substantially similar form.

In each instance, the date of the call coincides with the date of the purchase, both of which are reflected on the Customer Lists and the respective Payment Plan Agreements.  By matching each customer on the Customer Lists to a corresponding Payment Plan Agreement, Mey can demonstrate that each customer received a phone call from NAPC, as evidenced by the "per phone" notation.  Mey's expert, Ms. Verkhovskaya, has provided an administratively feasible method by which she will identify class members at scale by cross-comparing the Customer List with corresponding Payment Plan Agreements.  *See* III. A. ASCERTAINABILITY.  Ms. Verkhovskaya will testify in a unitary trial that each of the absent class members are party to a Payment Plan Agreement, which contains a "per phone" notation.  Based on this testimony, a jury could reasonably conclude that each of the absent class members received a call from NAPC.

Second, using common classwide evidence, Mey can prove that NAPC utilized artificial or prerecorded messages across the entirety of the class.  For starters, Mey will testify that she received a prerecorded message prior to purchasing a Matrix product from a NAPC representative.  That call was recorded and will be played to the jury.  The origins of that call will be confirmed by the emails and policy Mey received as a result of that call.  In addition to her own testimony, Mey has elicited sworn statements from similarly-situated class members that likewise received a

prerecorded message prior to purchasing a Matrix vehicle service contract from NAPC.[10]   Based on the identical experiences of a handful of witnesses, a jury can reasonably infer that it was NAPC's pattern and practice to sell Matrix products using prerecorded messages and that each class member received such a message in conjunction with their purchase.   Thus, the entire class will rely on the same inference drawn from a handful of witnesses at a unitary trial.

Third, as this Court has previously recognized, the facts relevant to vicarious liability are common to the class.   *See Venture Data*, 2017 WL 10398569, at *9 (holding that vicarious liability issue predominated over individual questions in TCPA case); *Vance*, 2022 WL 3044653 at *8; *see also Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 394-95 (M.D.N.C. 2015) (same); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (same); *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 234 (C.D. Cal. 2018) (same).

This stands to reason.   Vicarious liability turns on the federal common law of agency and can arise from actual authority, apparent authority, or ratification.   *In re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, No. 1:13-MD-2493, 2019 WL 7835630, at *4 (N.D. W. Va. Apr. 3, 2019) (Bailey, J.).   Actual authority depends only on relationships between Defendants and their vendor, NAPC.   *See id.*   Ratification depends on Defendants' post-call behavior without concern for any conduct by the

---

[10] For example, Jade Warren, Dan Lawshe, Kenneth Bean, Joseph Burker, and Catherine Shanahan, each of whom are prospective class members, testified that they received prerecorded messages prior to purchasing Matrix vehicle service contracts from NAPC.   *See* Exhibits 13-17.

class members. *See id.* Apparent authority depends on whether a reasonable person would believe that the caller, or the person that caused the calls to be made, had authority to act on behalf of Defendants. *See id.* Because the inquiry is limited to how a *reasonable* person would perceive the calls at issue, there is no need to determine how *individual* class members perceived the calls they received. *See Kristensen*, 12 F. Supp. 3d at 1306 (applying similar analysis). Thus, vicarious liability is a common question that can be resolved on a classwide basis through common evidence.

As noted by the Fourth Circuit, the TCPA's features of strict liability and statutory damages "evince an intent by Congress to allow consumers to bring their claims at modest personal expense. These same features also make TCPA claims amenable to class action resolution." *Krakauer*, 925 F.3d 663. This Court has recognized, courts routinely certify TCPA claims because the main questions are common to all recipients. *Venture Data*, 2017 WL 10398569, at *9 (collecting cases). Such holdings "are consistent with the Supreme Court's observation that the class certification requirements are 'readily met' in consumer protection cases where, as here, common factual questions necessarily center upon the defendant's course of conduct." *Id.* (citing *Amchem Prods.,* 521 U.S. at 625). This case is no different, compelling a similar result.

## B.   Superiority

In addition to predominance, Rule 23(b)(3) requires a plaintiff to "show that a class action would be superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). There are four, non-exhaustive factors relevant to this inquiry: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). As this Court has recognized, these factors are simply guidelines to help determine the benefits of a proposed class action. *Vance*, 2022 WL 3044653, at *9. Rule 23(b)(3) requires that the proposed class action "be superior to other methods of adjudication so that the class action will achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (cleaned up).

The first factor—interest in controlling individual prosecutions—weighs in favor of superiority. The putative class members' claims arise from the same standardized conduct and result in uniform damages across the class. The similarity of the putative class members' claims supports this factor because no one member of a TCPA class has an interest in controlling the prosecution of the action. *See Knapper v. Cox Communications, Inc.*, 329 F.R.D. 238, 247 (D. Ariz. 2019) (noting that individual litigation would be inefficient and increase litigation costs "particularly so for claims that all stem from the same cause of action and involve common issues."). "Where the putative class members' claims are so similar, a class resolution is often

20

superior to resolving each claim individually because it prevents reinventing the wheel for each putative class member." *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 299 (D. Utah 2021). The amount recoverable in statutory damages also supports this factor, where recovery is $500 to $1,500 per call. *See* 47 U.S.C. § 227 (b)(3)(B). The class action device is often superior where proceeding individually would be difficult for class members with small claims. *See Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 386 (2012) (recognizing that plaintiffs are unlikely to pay a $350 filing fee to advance an individual TCPA claim for $500). A class action resolution to this litigation "avoids this problem by aggregating what would otherwise be a series of too small potential individual recoveries." *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 333 (W.D. Okla. 2018) (cleaned up).

The second factor—the existence of other related litigation—also weighs in favor of superiority. This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits. *Vance*, 2022 WL 3044653, at *9. Mey is not aware any parallel or overlapping litigation concerning members of this proposed class, so there appears to be no risk of conflicting rulings or impediments from other litigation.

The third factor—desirability of concentrating the litigation in a particular forum—also weighs in favor of superiority. Like in *Vance*, the named plaintiff resides in this district. *Vance*, 2022 WL 3044653, at *9 ("This Court finds it desirable to concentrate the litigation in this judicial district given named plaintiffs' reside herein.").

The fourth and final factor—manageability—likewise weighs in favor of superiority. The "manageability" factor encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit. But, as this Court has recognized, "[m]anageability should rarely, if ever, be in itself sufficient to prevent certification of a class." *Vance*, 2022 WL 3044653, at *10. That said, this case does not present any unique concerns with regard to manageability. Each element of the class claims can be proven through common evidence. *See supra*, V. A. PREDOMINANCE. That NAPC called each member of the class will be evidenced by the testimony of a single expert witness, Ms. Verkhovskaya, relying on a collection of already-authenticated customer records.[11]

That each class member received a prerecorded or artificial message will be proven through the testimony of Mey and similarly-situated class members, each of whom will testify that they received a prerecorded or artificial message when they purchased the Matrix policy from NAPC. Based on these experiences, a jury can reasonably infer that it was NAPC's pattern and practice to sell Matrix products using prerecorded messages and that each class member received such a message in conjunction with their purchase. Thus, the entire class will rely on the same inference drawn from a handful of witnesses at a unitary trial. That Defendants are

---

[11] As for the Payment Plan Agreements, those records have been authenticated by the appropriate records custodian as domestic business records under Fed. R. Evid. 803 and 902. *See* Exhibit 20. As for Customer List 1, that record has likewise been authenticated by the appropriate records custodian as domestic business records under Fed. R. Evid. 803 and 902. *See* Exhibit 21. As for Customer List 2, that record was created and produced by Matrix.

vicariously liable for NAPC's conduct can similarly be proven via a handful of witnesses and a manageable number of documents.

The circumstances of this action include: standardized conduct by a single telemarketer, impacting numerous consumers who are geographically dispersed; and a potential recovery by an individual consumer that is most likely too small to justify bringing an individual action. Given these circumstances, class action certification enables consumers to obtain a financial recovery they might not have otherwise pursued on their own behalf, or which they might have been unable to pursue on their own behalf. This a model case for the application of the class action mechanism.

All told, certification of this class will effectuate the important social goals underlying the TCPA—a fact the Fourth Circuit strongly emphasized in *Krakauer*. *See Krakauer*, 925 F.3d 643. There, the Court observed that "the advantages of class resolution follow directly from the statute," which "creates a simple scheme for determining if a violation occurred, whether a defense is available, and what the damages ought to be." *Id*. at 659. This important private enforcement feature of the TCPA, the Court made clear, is tailormade for class-wide adjudication, noting that features of strict liability and statutory damages "evince an intent by Congress to allow consumers to bring their claims at modest personal expense. These same features also make TCPA claims amenable to class action resolution." *Id*. at 663. As informed by *Krakauer*, class resolution is the overwhelmingly superior method for resolving these claims.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should (i) certify a class as defined above, (ii) appoint Ms. Mey as the class representative, and (iii) appoint the undersigned attorneys as class counsel.

**DIANA MEY**

By Counsel:

/s/ *Andrew C. Robey*
Ryan M. Donovan (WVSB #11660)
Andrew C. Robey (WVSB #12806)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
rdonovan@hfdrlaw.com
arobey@hfdrlaw.com

## CERTIFICATE OF SERVICE

The undersigned counsel does hereby certify that on February 21, 2023, a true copy of the foregoing document was served upon all parties of record via ECF notification.

/s/ *Andrew C. Robey*
Andrew C. Robey (WVSB #12806)