**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

| | |
|---|---|
| **DIANA MEY, on behalf of herself and a class of others similarly situated,** | |
| Plaintiff, | |
| | **Civil Action No. 5:21-CV-62 (Bailey)** |
| v. | |
| **MATRIX WARRANTY SOLUTIONS, INC., et al.,** | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS MATRIX WARRANTY SOLUTIONS, INC. AND MATRIX FINANCIAL SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT

Defendants Matrix Warranty Solutions, Inc. ("Matrix") and Matrix Financial Services, LLC ("Matrix Financial") (collectively "Matrix Defendants"), by counsel, hereby submit their Memorandum in Support of their Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiff is suing the Matrix Defendants for four calls that occurred between April 27, 2017 and June 20, 2017.  Plaintiff does not know who made *any* of the four calls, which all had different caller IDs.  It is undisputed that neither Matrix Defendant has *ever* called her, and that Matrix Financial did not even exist then.  In Spring 2017, Matrix was less than a year into a new relationship with Southwest Reinsure, Inc. d/b/a Dealers Alliance Corporation ("DAC"), in which Matrix was helping DAC expand its vehicle service contract ("VSC") business. Matrix helped DAC expand its network by aesthetically redesigning DAC's VSCs to make them more consumer-friendly, introducing DAC to other sales channels, and providing DAC some other ancillary

services, such as fielding customer service calls generated from the expanded scope of business. Non-party National Auto Protection Corp. ("NAPC") was an independent third-party seller that Matrix introduced to DAC. DAC independently vetted NAPC and provided NAPC with authority to market DAC-administered VSCs by authorizing Matrix to enter into a producer agreement with NAPC. NAPC's methods for selling VSCs included telemarketing. At all relevant times, NAPC was simultaneously selling VSCs of other competitors.

Of the four calls at issue, the April 27, 2017 call is the only one where Plaintiff was able to identify an entity she spoke with—NAPC. It was not until the third leg of that call when Plaintiff first spoke with an NAPC representative. It is undisputed that Matrix's name was never mentioned on that call, and only appeared in a sample contract Plaintiff received in a link contained in an email NAPC sent her after the April 27, 2017 call.

Plaintiff's entire claim rests on Matrix being found vicariously liable for the April 27, 2017 call, where the calling party's identity is unknown. But even if we pretended that NAPC made that call, Matrix is not vicariously liable because it never controlled NAPC's sales or marketing operations—Matrix had *no involvement* in who NAPC sold to, what it sold, what it said on any given call, or the price NAPC sold any given product for. At all times NAPC was an independent contractor that simply promised to be responsible for the legal compliance of its sales and marketing operations. Matrix never made any manifestations to Plaintiff regarding authority NAPC had to act for Matrix, and NAPC never even said Matrix's name even once on the entire call. Thus, there is no viable agency claim based on actual or apparent authority. Any ratification claim similarly fails because it was not until August 2019 that Matrix first learned of *any* legal claims regarding NAPC's telemarketing practices. Matrix was never aware of NAPC's sale to Plaintiff until this lawsuit in 2021, and Matrix never benefited from that sale. The Matrix

Defendants are entitled to summary judgment on Plaintiff's claims based on a straightforward application of controlling Fourth Circuit precedent and this Court's own TCPA decisions.

## STATEMENT OF UNCONTROVERTED FACTS

Pursuant to LR Civ P 7.02, the following are the relevant, uncontroverted facts.[1]

1.     Plaintiff is seeking damages for four calls she allegedly received from one or more non-parties on wireless lines.[2] Plaintiff alleges those calls occurred on April 27, 2017 (Call 1), May 19, 2017 (Call 2), May 22, 2017 (Call 3), and June 20, 2017 (Call 4). *See* **Ex. 3** at 3.

2.     Plaintiff claims the Matrix Defendants are vicariously liable for those four calls.[3]

3.     During the four calls at issue, Matrix was a program manager for DAC, where Matrix's principal responsibilities to DAC included improving DAC's VSC designs, identifying additional sales channels, and providing some customer support for certain VSC customers.  *See infra.* Statement of Uncontroverted Facts ("SUF") ¶¶ 19, 20.

4.     After the four calls at issue, in the latter half of 2017, Matrix began administering its own VSCs.[4]

---

[1] Plaintiff authenticated Exhibits 3, 7, 8, 9, 10, 11, 17, and 18 of this Motion at her deposition. *See* Deposition of Diana Mey ("Mey Dep.") at 23:21-24:13; *id.* at 40:25-41:16; *id.* at 71:21-72:19; *id.* at 77:10-19; *id.* at 81:3-10; *id.* at 122:8-123:11; *id.* at 205:15-206:6; *id.* at 212:4-213:15; *id.* at 218:19-21; *id.* at 219:7-19; *id.* at 221:19-23; *id.* at 222:10-224:2, attached as **Exhibit 1**. Matrix authenticated Exhibits 13 and 15 of this Motion. *See* Deposition of Matrix ("Matrix Dep.") at 51:8-21; *id.* 56:9-20, attached as **Exhibit 2**.

[2] *See* Plaintiff's second Supplemental Responses to Matrix Defendants' First Set of Discovery Requests at 3 (explaining that Plaintiff's claims against the Matrix Defendants are limited to four calls she allegedly received "in the Spring of 2017"), attached as **Exhibit 3** (also Mey Dep. Exhibit 3); *see also* Plaintiff's first Responses to Matrix Defendants' First Set of Discovery Requests at 3-4, 6 (listing 304-281-XXXX and 304-905-XXXX as "wireless" lines on which Plaintiff received the four calls at issue), attached as **Exhibit 4**.

[3] *See* **Ex. 4** at 5. (Plaintiff only seeks to hold the "Matrix Defendants [] vicariously liable").

[4] *See* Matrix Dep. at 59:11-17 (Matrix testifying that it did not begin administering VSCs until around August 2017); *see also* Matrix Defendants' Objections and Responses to Plaintiff's First Set of Combined Discovery Requests at 4, attached as **Exhibit 5** ("Prior to the latter half of 2017, Matrix did not have the ability to administer and insure its own products[.]").

5.     Matrix Financial was not formed until July 14, 2017, after the calls at issue occurred. *See* Matrix Financial Entity Details from Delaware Department of State: Division of Corporations and Certificate of Formation of Matrix Financial Services LLC (a Delaware Limited Liability Company), attached as **Exhibit 6**.[5]

6.     The Matrix Defendants do not make *any* outbound sales calls to consumers, and did not make the calls at issue.[6]

7.     Plaintiff alleges that Calls 1 and 2 contained pre-recorded messages. *See* Complaint ¶¶ 20, 23, ECF No. 1.

8.     Plaintiff did not answer Calls 3 or 4, and they did not contain artificial or prerecorded messages.[7]

9.     It is unknown who made any of the four calls at issue, each of which contained different caller IDs.[8]

---

[5] Matrix Financial now "acts as an insurer and guarantor for anticipated liabilities under the [VSCs] administered by Matrix Warranty." Declaration of Jay Tuerk ¶ 8, ECF No. 21-1 ("Tuerk Decl.").

[6] *See* **Ex. 4** at 5 ("Plaintiff does not allege that Matrix Defendants are directly liable for physically placing the calls themselves."); *see also* Matrix Dep. at 90:13-14 ("A. Matrix doesn't have agents that make phone calls[.]"); Tuerk Decl. ¶ 10 (The Matrix Defendants "did not directly or indirectly initiate any of the alleged calls to Plaintiff[.]").

[7] *See* **Ex. 3** at 3; *see also* Mey Dep. at 17:25-18:2 ("Q. Is it still your understanding that you didn't answer [Call 3]? A. Yes."); *id.* at 18:13-15 ("Q. You didn't answer [Call 4], either, correct? A. Well, to clarify, my answering machine picked up[.]"); *id.* at 20:12-15 ("I do know that there was not an actual recording of somebody or a pre-recorded message that spoke during [Calls 3 and 4].").

[8] *See* Mey Dep. at 115:6-10 ("**Q. So is it possible that whomever was using 'This is Heather from dealer processing services' message is not National Auto Protection Corp? . . . A. That's possible[.]**"); *id.* at 35:18-36:6 (A. "I am not – you know, because there is so many different moving parts and different companies, I don't have an exact understanding of how it works. . . . I mean, even sitting here today, having, you know, gone – listened to these calls and engaged with some of these callers, it's still difficult for me to figure out who does what. But I do know, you know, sometimes there is a center that initiates the pre-recorded call, which was the case here. Then that's transferred to a call center. Then that's transferred to a verification center."); *id.* at 28:18-29:18 ("Q. What is your understanding of who made the four calls listed in your second supplemental answer on Page 3 of Exhibit 3? A. . . . I understand that there is lots of parties involved. In fact, with the auto warranty there is so many different entities involved in the initiation and the ultimate, you know, sale of the – sale of the warranty, that it's hard to keep track of who is actually involved in the call. . . . So I – you know, there are multiple parties that are involved in making these calls. . . . So as I'm sitting here, without looking directly at my notes, its hard to say."); *see also* Mey Notes (bates labeled

3

10.     The names of the Matrix Defendants were not mentioned on the two calls Plaintiff answered (Calls 1 and 2), and she recorded the content of both Calls 1 and 2.[9]  Again, there was no communication at all in Calls 3 or 4, which Plaintiff did not answer or record. *See supra* SUF ¶ 8.

11.     Plaintiff produced a recording that she claims was delivered with Call 2, showing that she did not speak with a live person on that call or identify who may have made that call. *See* **Ex. 9** (transcript of what Plaintiff claims is her recording of Call 2); *see also* Compl. ¶ 23.

12.     During the April 27, 2017 call, Plaintiff purchased a VSC from non-party NAPC. *See* April 27-28, 2017 emails exchanged between Plaintiff and NAPC (bates labeled MEY000096-118), attached as **Exhibit 10** (also Mey Dep. Exhibit 8); *see also* **Ex. 8** (transcription of what Plaintiff claims is her recording of Call 1).

13.     After the purchase, Plaintiff received an email from NAPC that included a link. *See* **Ex. 10** at MEY000098-99. Plaintiff claims that clicking on that link led to a VSC stamped "SPECIMEN."[10] Matrix Financial's name does not appear in the specimen. *See* **Ex. 10** at MEY000102-109. (Again, it did not even exist yet.) Matrix's name appears in the specimen, along with several other company names, like National Motor Club, LLC and DAC. *Id*. DAC is the

---

MEY000150) (listing the calling numbers for the four calls at issue as 682-267-1875, 505-717-0838, 484-223-3341, and 610-426-0985. Noting for Calls 3 and 4, online consumer complaints attribute the caller IDs to "prerecorded 'Heather' message calls about expired vehicle warranty."), attached as **Exhibit 7** (also Mey Dep. Exhibit 5).

[9] *See* Mey Dep. at 71:21-72:19 (showing Plaintiff's stipulation to the fact that she has call recordings of the two calls she answered, and the Matrix Defendants were not mentioned during either call); *see also* transcripts of the recordings of Calls 1 and 2, attached as **Exhibits 8** and **9**, respectively (also Mey Dep. Exhibits 36 and 37).

[10] *See* Mey Dep. at 84:21-85:8 ("Q. After you got the e-mail, you indicate to her 'I tried clicking on the link in this e-mail to open the policy but I keep getting an error message that says the PDF failed to load???' Right? A. Right. Q. And then she responds to you that she apologizes. 'I have resent the e-mails. If you still can't open it, please let us know and we will try something else.' Right? A. Right. Q. Now, later in this packet it looks like she did resend it, right? A. Right."); *see also* **Ex. 10** at MEY000102-109.

identified administrator and obligor of the specimen VSC. *Id*. at MEY000108; *see also* Compl. ¶ 22.

14.     Plaintiff admits that the name "Matrix" was never used in Call 1 (or any other call at issue); she testified she first saw Matrix's name in the specimen VSC she claims to have opened via a link contained in an email from NAPC.[11]

15.     Within an hour of purchasing the VSC, Plaintiff asked NAPC to cancel her purchase. *See* **Ex. 10** at MEY000096. The purchase was canceled and Plaintiff received a refund from NAPC. *Id*.[12]

16.     Plaintiff's VSC-cancellation request to NAPC did not include a do-not-call request, nor did she ever make such a request to NAPC.[13]

17.     The Matrix Defendants did not receive any benefit from Plaintiff's momentary purchase from NAPC. *See* **Ex. 11**.[14] The Matrix Defendants never knew about Call 1 or Plaintiff's ephemeral transaction with NAPC until this lawsuit.[15]

---

[11] *See* Mey Dep. at 34:22-36:20 (Plaintiff acknowledging that her understanding of Matrix's involvement with the calls at issue came upon her post-call receipt of a policy "with Matrix's name on it."); *see also* 84:21-85:8 (Plaintiff testifying she reviewed the specimen VSC by clicking a link contained in an e-mail); *supra* SUF ¶ 10.

[12] *See also* Mey Dep. at 85:24-25 ("Q. Did you get the refund . . . ? A. Yes."); American Express correspondence confirming refund (bates labeled MEY000120), attached as **Exhibit 11** (also Mey Dep. Exhibit 9)**.**

[13] *See* **Ex. 10** at MEY000116 ("I changed my mind. I don't want the policy. Can you cancel please."); *see also* Mey Dep. at 170:21-23 (Plaintiff acknowledging she never sent a do-not-call request to NAPC); *id*. at 168:24-169:6 (same).

[14] *See also* Mey Dep. at 180:12-15 ("Q. Ms. Mey, do you have any evidence that either of the Matrix defendants benefited in any way from your purchase of the policy on April 27, 2017? A. No.").

[15] *See* Matrix Dep. at 84:11-86:5 ("Q. Do you believe [Plaintiff] was sold the [VSC] that is Exhibit 5? . . . A. I don't know if I'm in a position to say because it's not something that [Matrix] produced or had access to. [Matrix wasn't] aware of it until it was brought up in this suit" and addressing that Matrix has no record of the purchase and it is not in Matrix's system); *see also* DAC's list of DAC-administered VSCs sold by NAPC (failing to show any sale to Plaintiff), attached as **Exhibit 12** (also Mey Dep. Exhibit 26).

18.     It is unknown whether the specimen VSC is an accurate representation of the VSC Plaintiff purchased on April 27, 2017. *See* **Ex. 5** at 4.[16]  Plaintiff never deposed DAC, and neither her name nor any VSC associated with her appears on the customer list that DAC produced in response to Plaintiff's document subpoena in this case. *See* **Ex. 12**.

19.     In Spring 2017, Matrix served as a program manager for DAC pursuant to a Program Manager Agreement.[17] (Matrix Financial was not a party to or mentioned in that agreement (again, it did not exist then). *See* **Ex. 13**.) In that role, Matrix's limited responsibilities included improving the aesthetic design of DAC-administered VSCs, assisting DAC "with finding companies to market them[,]" and in certain instances, answering questions from purchasers of DAC-administered VSCs. **Ex. 5** at 3.[18] Matrix's role relating to the marketing or selling of DAC's products included introducing third-party marketing companies to DAC.[19]

---

[16] *See* Matrix Dep. at 84:11-86:5; *id*. at 47:5-6 ("[O]bviously, that wasn't a Matrix-administered contract that was sold.").

[17] **Ex. 5** at 3 ("Matrix served as a 'program manager' for DAC."); *see generally* Program Manager Agreement, attached as **Exhibit 13** (also Matrix Dep. Exhibit 4).

[18] *Id*. at 4 ("Matrix had no contract with the buyer of any DAC contract sold using a Matrix-licensed policy design."); *see also* Matrix Dep. at 58:25-59:7 ("A. [DAC] drafted the producer agreements and gave [Matrix] the opportunity to court producers and bring them to [DAC] and – and [DAC] approv[ed] them or – [DAC] had the final approval and everything. . . . [DAC] gave [Matrix] the opportunity to bring these producers to [DAC] and then [have the producers] market and – and sell [DAC] products"); *id*. at 70:17-71:4 ("Q. Who drafted the [VSCs] that were sold by NAPC in April of 2017? A. . . . DAC drafted the language and Matrix did the aesthetic[s.]"); *id*. at 73:7-16 (A. "if you called [1-855-500-MATRIX], you would be prompted with a few different [] automated options. And, for example, if it said press 1 for claims, it would go to DAC. And if it was, like, press 2 for customer service, it would go to Matrix. And from there, if it was . . . a question about the contract, [Matrix] would try to help. But if it was about . . . whether this would be covered, [Matrix] would have to transfer it to DAC[.]").

[19] *See* **Ex. 5** at 3-4 ("While Matrix sought out and introduced certain independent marketing companies to DAC, . . . Matrix was not in any way involved with the marketing or selling of DAC's products.").

20.     "DAC independently vetted" the marketing companies Matrix introduced to DAC. *Id*. at 4. DAC possessed the sole authority over whether Matrix could authorize any independent marketing company to market and sell DAC-administered products.[20]

21.     NAPC was one of the independent marketing companies Matrix introduced to DAC.[21] DAC authorized Matrix to enter into an agreement with NAPC authorizing it to market and sell DAC-administered VSCs, and created the producer agreement entered into between NAPC and Matrix. *See* Matrix Dep. at 49:14-50:2.[22] (Matrix Financial was not a party to or mentioned in that NAPC Producer Agreement. *See* **Ex. 15**.)

22.     At all times relevant to this Lawsuit, the Matrix Defendants "did not direct or control any party that []market[ed] DAC's products[,]" including NAPC. *See* **Ex. 14** at 5.[23]

23.     The Producer Agreement established that NAPC was an independent contractor and required NAPC to comply with all applicable laws when marketing VSCs.[24]

---

[20] *See* Matrix Dep. at 47:21-48:3 ("Q. How do you know that NAPC was a producer for DAC? . . . A. . . . because NAPC marketed and sold DAC-administered products, and DAC had the final approval, whether you know, to take them on as a producer or [DAC] had the final say to cut them off as a producer.").

[21] *See* Matrix Dep. at 49:14-50:2 ("Q. So NAPC was a producer for Matrix? . . . A . . . the producer agreement itself was something that DAC had drafted up, and Matrix is the entity that . . . courted and brought the producer to DAC and contracted with them through DAC's . . . agreement that they drafted up. . . . DAC still had the final say. Like, [Matrix] couldn't just sign someone up for DAC. [DAC] had to approve. And [DAC] vetted – I believe they vetted NAPC themselves through a background check.").

[22] *See also* Matrix Dep. at 51:22-52:1 ("Q. Did you previously say DAC drafted the direct marketing producer agreements? A. Yes. I mean, essentially, Matrix copied and – and pasted what DAC had provided them and then put their logo in the top left."); Matrix Defendants' Objections and Responses to Plaintiff's Second Set of Combined Discovery Requests at 3 ("in April of 2017, DAC–not either of the Matrix Defendants–was the party that would have authorized NAPC to sell" DAC-administered VSCs), attached as **Exhibit 14**; Direct Marketing Producer Agreement ("Producer Agreement"), attached as **Exhibit 15** (also Matrix Dep. Exhibit 2).

[23] *See also* Matrix Dep. at 69:24-70:16 (explaining that Matrix did not share office space or employees with NAPC, Matrix and NAPC did not use a common customer relationship portal or computer system, and Matrix did not provide NAPC with scripts to be used on outbound calls)*; id.* at 33:25-34:3 (the independent marketing companies "run their own independent operations and sell our competitors' products as well. So there's not a level of control that [Matrix] exercise[s] over them[.]").

[24] *See* **Ex. 15** at 4 ("[NAPC] shall at all times be considered an independent contractor[.]"); *id*. at 2 ("[NAPC] shall familiarize itself and comply with all state and federal laws and regulations applicable to its activities authorized by this Agreement.").

24.     NAPC bore all of its own expenses relating to its marketing efforts.[25]

25.     The Matrix Defendants never paid NAPC for sales of any products.[26]

26.     At all times relevant to this case, NAPC was also selling VSCs for competitors of DAC, such as SunPath, Ltd. (an administrator of VSCs).[27]

27.     Plaintiff has no personal knowledge of the Matrix Defendants' relationship with NAPC.[28]

28.     At all times relevant to the calls at issue, Matrix had no knowledge that NAPC made unlawful telephone calls, or of any complaints that it did.[29]  Matrix's first knowledge of any such claim did not come until several years later, in late Summer 2019, in connection with a lawsuit filed by Ms. Shanahan in the Northern District of Illinois, from which Matrix was dismissed after the Court found that she had not plausibly shown, after extensive jurisdictional discovery, that Matrix could be vicariously liable for NAPC's call(s) to her.  *See* Matrix Dep. at 54:18-55:4.

---

[25] *See* **Ex. 15** at 2-3 ("[NAPC] shall bear all of its business expenses and marketing costs in the performance of its duties and obligations under this Agreement[.]").

[26] *See* Matrix Dep. at 63:22-64:3 (explaining that for each DAC-administered VSC NAPC sold, NAPC received its wholesale price as revenue, DAC received the rest, and DAC paid Matrix its fee for its services.).

[27] *See* List of SunPath, Ltd. VSCs sold by NAPC from January 2, 2017 to September 4, 2019, attached as **Exhibit 16**; *see also* Mey Dep. 174:14-17 (Plaintiff recalling that NAPC sold products administered by companies other than DAC and Matrix).

[28] *See* Mey Dep. 37:4-7 ("A. I have limited knowledge of how all these things work, who makes the most money, who instructs who. I leave that up to the attorneys to investigate and make that call."); *id.* at 172:24-173:4 ("Q. Do you have any reason to believe that either of the Matrix defendants ever controlled the scripts that [NAPC] used when communicating with consumers? . . . A. I personally don't know.") *id.* at 174:6-10 ("Q. Do you have any reason to believe whether Matrix controlled the extent to which NAPC sold a Matrix product as opposed to the product of one of Matrix's competitors? A. No.").

[29] *See* Matrix Dep. at 54:18-55:4 ("Q. Prior to May 2020, had Matrix received complaints – TCPA related complaints with regard to NAPC? . . . A. I think we were in the middle of [a 2019 filed complaint] when I came in. So the answer would be yes. . . . Q. Anything other – any other complaints besides [the 2019 filed complaint] prior to May 2020? A. I believe [that] was the first[.]").

29.     Plaintiff made a demand to and received compensation from a non-party competitor of Matrix's for several allegedly unlawful calls, including the same four calls at issue here.[30]

## II.     LEGAL STANDARD

Summary judgment should be granted where no genuine issue of material fact exists for resolution at trial, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted).

A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*  The burden of establishing that no genuine issue exists is on the party moving for summary judgment.  *See Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 662 n.18 (1973) (internal citation omitted). "And the moving party need not necessarily 'produce evidence showing the absence of a genuine issue of material fact.'" *Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 486 (4th Cir. 2021) (quoting *Celotex*, 477 U.S. at 325). "Rather, 'the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325); *see also Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) ("[U]nder *Celotex*, the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can

---

[30] *See* Mey Dep. at 205:15-224:2; *see also* Plaintiff's correspondence with a non-party competitor of DAC, attached as composite **Exhibit 17** (also Mey Dep. Exhibits 31-34).

prove his case.") (internal quotations omitted).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.  The non-moving party may not rest upon a "mere . . . scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 252.

### III.    ARGUMENT

### A.  Matrix is Entitled to Summary Judgment on Plaintiff's Section 227(b) Claim.

Plaintiff's Count I alleges a violation of 47 U.S.C. § 227(b) through the use of prerecorded messages on calls to her various phone numbers assigned to a wireless telephone service. Matrix is entitled to summary judgment for Calls 3 and 4 because Plaintiff admits that they contained *no* prerecorded message, an essential element of a prerecorded-call claim under 227(b). Matrix is also entitled to summary judgment for all four calls because there is no evidence from which Matrix can be found vicariously liable for the actions of the unknown caller(s). Even if Plaintiff had any evidence that NAPC made any of the four calls at issue, other than merely speaking with an NAPC representative on the third leg of Call 1, which she does not, Matrix is still entitled to summary judgment because the undisputed facts establish that Matrix cannot be found vicariously liable for NAPC's allegedly unlawful calls.

### 1.  Calls 3 and 4 Contained No Artificial or Prerecorded Messages.

By Plaintiff's own admission, it is undisputed that Calls 3 and 4 contained no artificial or prerecorded messages.[31] They were just unanswered calls from a stranger. A violation of 47 U.S.C.

---

[31] *See* Mey Dep. at 20:12-15 ("A. **I do know that there was not an actual recording of somebody or a pre-recorded message that spoke during**" Calls 3 or 4.) (emphasis added).

§ 227(b) is contingent on a call containing an artificial or prerecorded message. Therefore, Plaintiff cannot prove that *anyone* violated 47 U.S.C. § 227(b) on Call 3 or 4.

Plaintiff cannot rely on inadmissible evidence.[32] As she confirmed in deposition, her Complaint's reference to inadmissible hearsay evidence of unidentified, unproduced statements by strangers on the Internet is the sole basis for her claim that Calls 3 and 4 *would have* played a prerecorded message had she answered them.[33] There is no evidence about who made Calls 3 and 4, which Plaintiff admits did not even contain an artificial or prerecorded message. The Matrix Defendants are entitled to summary judgment on Plaintiff's claim that Calls 3 and 4 violated 47 U.S.C. § 227(b).

### 2.   Matrix is Not Vicariously Liable for Any of the Four Calls.

Plaintiff seeks to hold Matrix vicariously liable for the four calls at issue that allegedly violated 47 U.S.C. § 227(b). The FCC has interpreted "the TCPA to allow vicarious liability for violations of § 227(b)[.]" *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 251 (4th Cir. 2018) (citing *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013)). "[V]icarious liability under the TCPA is governed by federal common law of agency, 'including not only formal agency, but also principles of apparent authority and ratification.'" *Id.* at 252 (quoting *Dish Network, LLC*, 28 FCC Rcd. at 6584).  The identity of the party(ies) that made the calls at issue is unknown. Therefore, Plaintiff cannot prove the existence of a principal-agent relationship between Matrix and the unknown callers based on any of the principles of agency.

---

[32] *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) ("The summary judgment inquiry [] scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of **admissible** evidence, that could carry the burden of proof of his claim at trial.") (emphasis added); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

[33] *See* Mey Dep. at 111:15-20 (Plaintiff explaining that online consumer complaints are her sole basis for believing that Calls 3 and 4 would have contained prerecorded messages); *see also id.* at 115:21-116:16 (same); Compl. ¶¶ 24, 25 (same).

Even if Plaintiff could prove that NAPC initiated any of the four calls at issue, for which there is no evidence, there is no principal-agent relationship between Matrix and NAPC, such that Matrix cannot be found vicariously liable for any unlawful calls NAPC allegedly made.[34]

### i.   The Party(ies) That Made or Initiated the Calls is Unknown.

Plaintiff claims to have purchased a VSC from NAPC on April 27, 2017 during a call she received. *See* **Ex. 10**. The identity of party(ies) that "initiated" that call, or Calls 2-4, is unknown.[35] There is no evidence about who physically placed the calls at issue, or that NAPC controlled the unknown callers. Therefore, there is no one who can be determined as having initiated the calls at issue.  Plaintiff admits that she does not know.[36]  Matrix certainly does not. There is no evidence that identifies the calling party(ies). Without that, Plaintiff cannot prove that whomever initiated the calls was an agent of Matrix. Without an identified agent, Plaintiff cannot prove that Matrix or NAPC was this stranger's principal.[37]

### ii.   NAPC is Not an Agent of Matrix.

Plaintiff claims to have purchased a VSC from NAPC on the third leg of Call 1. Thus, NAPC remains the only entity that Plaintiff has identified from Call 1, and even then NAPC was only the third entity she claims to have spoken with on Call 1. Again, there is no evidence that NAPC initiated Call 1. She has no evidence of who that party is, and thus no evidence about that

---

[34] *See In re Monitronics Int'l, Inc.*, 223 F. Supp. 3d 514, 520 (N.D. W.Va. 2016) ("[V]icarious liability, like any other issue of fact, may be adjudicated summarily only where the evidence would not permit a reasonable jury to find for the nonmoving party." (quoting *Spitz v. Proven Winners N.A., LLC*, 759 F.3d 724, 731 (7th Cir. 2014))).

[35] *See In re Rules & Regulation Implementing the TCPA of 1991 et al.*, 30 FCC Rcd. 7961, ¶ 30 (2015) (For direct liability purposes, "we look at the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it[.]").

[36] *See* Mey Dep. at 35:18-36:6 (Plaintiff explaining her lack of understanding of who placed the calls at issue and the possibility that someone other than NAPC initiated the calls.); *id*. at 115:6-10 (same).

[37] *See Worsham v. Disc. Power*, Civil Action No. RDB-20-0008, 2022 U.S. Dist. LEXIS 139580, at *21 (D. Md. Aug. 4, 2022) (in granting summary judgment for the purported principal, the Court noted that the plaintiff "fail[ed] entirely to identify [ ] who actually initiated the seven telemarketing calls at issue[.]").

party's relationship with NAPC, such that she can make no *prima facie* agency case between non-party NAPC and the stranger that initiated Call 1.  But even if Plaintiff could fill that necessary link, which she cannot, there is no evidence that establishes a principal-agent relationship existed between Matrix and NAPC.

### a)  NAPC Acted Without Actual Authority.

The factual record shows that Matrix cannot be subject to vicarious liability via a theory of actual authority because Matrix did not control NAPC's operations. Moreover, the agreement between Matrix and NAPC provides that NAPC was an independent contractor and required to comply with all applicable laws related to its marketing conduct. A finding of vicarious liability through actual authority requires a showing that the parties acknowledge a principal-agent relationship explicitly exists, and that "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Monitronics*, 223 F. Supp. 3d at 524 (quoting Restatement (Third) of Agency § 2.01 (2006)).[38]

The central determination of whether an agency relationship existed through actual authority is the degree of control the purported principal exercised over the alleged agent. *See Monitronics*, 223 F. Supp. at 524 ("A key requirement of classic common law agency is that the principal is 'in control' of the agent's actions." (citing *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010))).[39]

---

[38] *See also Jones v. Royal Admin. Servs.*, 887 F.3d 443, 449 (9th Cir. 2018) (holding that to establish vicarious liability on actual authority grounds, the plaintiffs "must do more than establish an agency relationship. They must also establish actual authority to place the unlawful calls.").

[39] *Id.* at 525 (following a grant of summary judgment based on lack of actual authority for a TCPA defendant because with "all of these facts together in the light most favorable to Plaintiffs, the evidence does not support a finding that [the purported principal] exercises control over the actual marketing of its third-party distributors and/or authorized dealers[.]"); *see also Jones*, 887 F.3d at 450 ("In determining whether vicarious liability may be imposed, the 'extent of control exercised by the [principal]' is the 'essential ingredient.'" (quoting *Bonds*, 608 F.3d at 505)); *Mey v. Pinnacle Sec., LLC*, Civil Action No. 5:11CV47, 2012 U.S. Dist. LEXIS 129267, at *15 (N.D. W.Va. Sept. 12, 2012) (granting summary judgment for TCPA

There is no dispute that Matrix did not direct or control the operations of NAPC.[40] It is undisputed that when Plaintiff's four calls at issue occurred, it was DAC, not Matrix, that had the sole authority to allow NAPC to sell the DAC-administered VSC Plaintiff claims to have momentarily purchased, such that Matrix lacked control over NAPC.[41] It is also undisputed that NAPC was simultaneously selling DAC's and, later, Matrix's competitors' VSCs. *See* **Ex. 16**.

There is no evidence here of the relevant control factors that this Court has previously held to preclude summary judgment on actual authority. Specifically, Matrix did not exert control over any aspect of NAPC's calling operations—**Matrix provided no input into, and had no ability to control, who NAPC employed, how it trained them, who NAPC called (if anyone), how NAPC got their leads, what was said on any given call, what NAPC sold on any given call, or what price it sold any product for**.[42] Again, NAPC sold *thousands* of VSCs administered by one

---

defendant where plaintiff "presented no evidence to suggest that Pinnacle ha[d] control over the means and manner by which its lead generators place[d] calls[.]"); *Worsham,* 2022 U.S. Dist. LEXIS 139580, at *20 (granting summary judgment for TCPA defendant where the agreements showed that independent contractor relationships were created with purported agents and "agreements expressly provide that the third-party telemarketers retain control over their activities[.]").

[40] *See* **Ex. 15**; *see also* Matrix Dep. at 69:24-70:16 (explaining that **Matrix did not share office space or employees with NAPC, Matrix and NAPC did not use a common customer relationship portal or computer system, and Matrix did not provide NAPC with scripts to be used on outbound calls**)*; id.* at 33:22-34:3 ("A. [the producers] run their own independent operations and sell our competitors' products as well. So there's not a level of control that [Matrix] exercise[s] over them[.]").

[41] *See* Matrix Dep. at 49:14-50:2 ("Q. So NAPC was a producer for Matrix? . . . A . . . the producer agreement itself was something that DAC had drafted up, and Matrix is the entity that . . . courted and brought the producer to DAC and contracted with them through DAC's . . . agreement that they drafted up. . . . DAC still had the final say. Like, [Matrix] couldn't just sign someone up for DAC. [DAC] had to approve. And [DAC] vetted – I believe they vetted NAPC themselves through a background check."); *id.* 47:21-48:3 (same).

[42] *See Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 787-88 (N.D. W.Va. 2017) (denying summary judgment on vicarious liability to TCPA defendant where plaintiff presented evidence "that [purported principal] exerts control over [purported agent's] calling operations[,]" which included that the purported principal "determines what numbers [purported agent] will dial, and when[,]" and the purported principal "pre-determines every word [purported agent]'s interviewers will say."); *see also Jones*, 887 F.3d at 453 (holding there was not sufficient control to establish vicarious liability where the "[the purported agent] was its own independent business that sold VSCs for multiple companies without the direct supervision of a Royal employee. [The purported agent] provided its own equipment, set its own hours, and only received payment if one of its telemarketers actually made a sale[.]").

competitor alone. **Ex. 16**. And with the one recording Plaintiff has of her call with NAPC, Matrix's name was *never mentioned* during the call or in the emails. If this is control, Plaintiff is asking this Court to reverse its entire body of agency law and the federal common law of agency that the FCC directed courts to follow in adjudicating TCPA claims of vicarious liability.

The agreement between Matrix and NAPC further shows that NAPC was not Matrix's agent, and certainly did not have actual authority to engage in any behavior that violated the TCPA. First, the agreement provided that NAPC was an independent contractor, not an agent.[43] Additionally, the "LAWS AND REGULATIONS" provision in the agreement provided that NAPC "shall familiarize itself and comply with all state and federal laws and regulations applicable to its activities authorized by this Agreement." *See* **Ex. 15** at 2.[44] There is no evidence

---

[43] *See* **Ex. 15** at 4 ("NAPC shall at all times be considered an independent contractor, and nothing in this Agreement is intended or shall be construed to create an employment, joint venture, or partnership relationship between [Matrix] and [NAPC] or between [Matrix] and any of [NAPC]'s employees, agents, and sub-contractors."); *see also Makaron v. GE Security Mfg. Co.*, CV-14-1274-CW(AGRx), 2015 U.S. Dist. LEXIS 75240, at *19-20 (C.D. Cal. May 18, 2015) (granting motion for summary judgment due to lack of actual agency despite license to use trademarks and logos because applicable contracts indicated the dealers were independent contractors).

[44] Other jurisdictions have also ruled that actual authority does not exist when examining similar contractual provisions. *See, e.g., Jones*, 887 F.3d at 446 ("Any claim that [purported agent] had actual authority to place calls is precluded by the express language in Royal's contract with [the purported agent] expressly prohibiting telemarketing methods that would violate state or federal law[.]"); *McDermet v. DirectTV, LLC*, Civil Action No. 19-11322-FDS, 2021 U.S. Dist. LEXIS 11123, at *21 (D. Mass. Jan. 21, 2021) (ruling in a TCPA case that actual authority did not exist because the defendants required the telemarketers to comply with state and federal telemarketing laws); *Simmons v. Charter Commc'ns., Inc.*, 222 F. Supp. 3d 121, 137 (D.Conn. 2016) ("there is no better way to ensure compliance with the TCPA than to include such compliance as an essential term of the contract."); *Black v. SunPath Ltd.*, Case No. 3:21-cv-00023, 2022 U.S. Dist. LEXIS 165799, at *9-10 (M.D. Tenn. Sep. 14, 2022), *appeal dismissed*, No. 22-5927 (6th Cir. Dec. 22, 2022) ("By relying on the formal contract between the parties, without any additional evidence of a broader, implicit understanding between SunPath and [an independent third-party seller], [Plaintiff] has placed herself in the difficult position of trying to establish authority to perform an act based on an agreement that clearly and emphatically forbids that act under any circumstances." (citing *Kern v. VIP Travel Servs.*, Case No. 1:16-CV-8, 2017 U.S. Dist. LEXIS 71139, at *19 (W.D. Mich. May 10, 2017))).

that contradicts that the provisions of the Producer Agreement represent the true relationship between Matrix and NAPC.[45]

NAPC was an independent contractor, and there is no genuine issue of fact as to actual authority; she cannot show any actual exercise of Matrix's authority over NAPC, or any right to control or direct the actions of NAPC, who clearly conducted business in its own name and on its own terms. The only contractual restriction on NAPC was that it comply with the law, which courts have held to preclude agency claims regarding illegal acts. The Fourth Circuit has ruled that summary judgment is properly granted to the vicarious-liability TCPA defendant when there is no evidence on which the jury could reasonably ground an agency relationship. *Cf. Hodgin*, 885 F.3d at 254 (holding that the defendants were "entitled to summary judgment because there was no triable issue" as to the ratification principal of agency.).[46] Because Matrix did not in any way direct or control NAPC's operations, and given the express provisions of the agreement with NAPC, Matrix cannot be subject to liability in this matter through a theory of actual agency.

### b) NAPC acted without apparent authority.

Matrix is not subject to liability through apparent authority either. That is because Matrix *never* made *any* manifestations to Plaintiff regarding NAPC (or anything else). "Apparent authority results from a principal's manifestation of an agent's authority to [plaintiff], regardless of the actual understanding between the principal and agent." *Sing Fuels Pte Ltd. v. M/V Lilia Shanghai (IMO 9541318)*, 39 F.4th 263, 275 (4th Cir. 2022) (citing *Auvil v. Grafton Homes, Inc.*,

---

[45] *See* Mey Dep. at 172:24-173:4 ("Q. Do you have any reason to believe that either of the Matrix defendants ever controlled the scripts that [NAPC] used when communicating with consumers? . . . A. I personally don't know.") *id*. at 174:6-10 ("Q Do you have any reason to believe whether Matrix controlled the extent to which NAPC sold a Matrix product as opposed to the product of one of Matrix's competitors? A. No.").
[46] *See also Monitronics*, 223 F. Supp. 3d at 527 (finding on a motion for summary judgment that no actual agency relationship existed even where the purported agents "were permitted to hold themselves out as authorized dealers or some similar description[.]").

92 F.3d 226, 230 (4th Cir. 1996)).[47] An agent only binds a principal through apparent authority "when the principal . . . causes [plaintiff] to rely on the agent's [apparent] authority to act on the principal's behalf," and plaintiff exercises "'good faith' and 'reasonable prudence' in their reliance[.]" *Id*. "[A]n agent's statements that he has [] authority" does not create apparent authority; rather, the plaintiff's belief must be "traceable to manifestations of the principal." *Id*. (quoting Restatement (Third) of Agency § 3.03 cmt. b.).

Fatal to any claim of apparent authority here, there was never any manifestation—or any communication whatsoever—from Matrix to Plaintiff. Because Matrix never made any representations to her, she could have formed no reasonable beliefs about NAPC's apparent authority based on statements Matrix never made.[48] Matrix never spoke to Plaintiff before her call with NAPC, and was not even aware that NAPC had called Plaintiff until this lawsuit.[49] In fact, the first known communication between Plaintiff and Matrix did not occur until December 15,

---

[47] *See also Monitronics*, 223 F. Supp. 3d at 520 ("To create apparent authority, the principal must speak, write, or otherwise act toward [the plaintiff]." (citing *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2000))); *Dave v. Century 21 Real Estate*, CA: 4:20-cv-00840-JD, 2021 U.S. Dist. LEXIS 225282, at *14 (D.S.C. Sep. 15, 2021) ("To establish apparent agency, it is not enough simply to prove that the purported principal by either affirmative conduct or conscious and voluntary inaction has represented another to be his agent; rather, the third party must also establish that he or she reasonably relied on the 'authority *originated by the principal*' and that such reliance changed his or her position." (quoting *Triplett v. Soleil Grp., Inc.*, 644 F. Supp. 2d 654, 653 (D.S.C. 2009))).

[48] *See Akers v. Minn. Life Ins. Co.*, 35 F. Supp. 3d 772, 785 (S.D. W.Va. 2014) (finding a lack of apparent authority where there was "no evidence that . . . the principal [] ever indicated to . . . the third party" that the purported agent "had the authority to settle" the claims, "nor does [the third party] identify any representation . . . that he relied upon to form a belief that [the purported agent] had the authority to settle" the claims. "Indeed, [the third party] never indicated he received any communication from [the principal] at all."); *see also Black*, 2022 U.S. Dist. LEXIS 165799, at *11 ("Black's description of the defendants' scheme demonstrates why [apparent authority] is a poor fit here. . . . SunPath did not—and indeed had no opportunity—to manifest an agency relationship to Black prior to or during the underlying calls[.]").

[49] *See* Matrix Dep. at 84:11-86:5 ("Q. Do you believe [Plaintiff] was sold the [VSC] that is Exhibit 5? . . . A. I don't know if I'm in a position to say because it's not something that [Matrix] produced or had access to. [Matrix wasn't] aware of it until it was brought up in this suit" and addressing that Matrix has no record of the purchase and it is not in Matrix's system).

2020, which was initiated by Plaintiff's counsel.[50] Thus, there were no manifestations by Matrix to Plaintiff regarding any authority NAPC had to make calls or sell VSCs for Matrix. It is also undisputed that Matrix's name was **never mentioned** at all during the April 27, 2017 call.[51] Therefore, while irrelevant, there were also no manifestations made by the unknown calling party or NAPC to Plaintiff regarding any authority either may have had relating to Matrix.

Indeed, the evidence shows that Plaintiff *did not believe* that the NAPC call was even related to Matrix—she first demanded and extracted private settlement funds for these four 2017 calls from one of Matrix's competitors in late 2019 and 2020, claiming that the very same four calls at issue were made by or on behalf of a non-party VSC industry competitor.[52]  While she claims to have already deleted that evidence, it is undisputed that she first articulated a belief that the NAPC-related calls were for the benefit of *a non-party competitor*, not Matrix.[53]

But, again, even when she proceeded to pursue this recycled claim from Matrix for these same calls in 2021, there is still no evidence that Matrix cloaked NAPC with apparent authority by making any manifestations to Plaintiff before or during the call that Plaintiff could have reasonably relied upon.[54] Matrix was not even in a position to cloak NAPC in apparent authority because NAPC was selling DAC-administered products, not Matrix products, in Spring 2017.[55]

---

[50] *See* Plaintiff's December 15, 2020 correspondence to Matrix, attached as **Exhibit 18** (also Mey Dep. Exhibit 15).

[51] *See* Mey Dep. at 71:21-72:19 (showing Plaintiff's stipulation to the fact that Matrix is not mentioned on the relevant call recordings).

[52] *See generally* **Ex. 17**; *see also* Mey Dep. at 205:15-224:2 (Plaintiff addressing that she previously made a demand for multiple calls, including the four calls at issue, to non-party competitor of DAC and entered into a settlement agreement with them that included the four calls at issue.)

[53] *See* Mey Dep. at 205:15-224:2; *see also id.* 133:15-134:2 (Plaintiff testifying that she purged documents related to her TCPA cases, claims, and settlements "once the taxes were filed[.]"); **Ex. 17**.

[54] *See Sing Fuels Pte*, 39 F.4th at 277 (upholding the district court's finding of no apparent authority where there was a complete lack of communication between the relevant third party and the purported principal regarding the purported agent's authority, which left the court "wanting for a manifestation from" the purported principal).

[55] *See* Matrix Dep. at 47:5-6 ("[O]bviously, that wasn't a Matrix-administered contract that was sold.").

The lack of any manifestation by Matrix to Plaintiff entitles Matrix to summary judgment on the theory of apparent authority, and she clearly has no credible claim to any "reasonable belief" that NAPC had the authority to act for Matrix on the calls at issue.

This Court has also correctly rejected the idea that apparent authority agency applies in cases like this, where the putative agent sells the products of the putative principal's competitors.[56] The Court explained this in *Monitronics*:

> [T]he fact that entities were permitted to hold themselves out as authorized dealers or some similar description is insufficient to hold the moving defendants in this case liable. This Court is well aware that in so ruling, I am rejecting the prior decision of this Court in this case. In *Mey v. Monitronics International, Inc.*, 959 F.Supp.2d 927 (N.D. W.Va. 2013), this Court denied a motion for summary judgment on the basis that the fact that VMS was permitted to hold itself out as an authorized dealer cloaked VMS with the apparent authority to act as the agent of UTC. This Court respectfully disagrees with that ruling. As noted by *Leon* and echoed in *Makaron*, **the mere fact that a dealer uses a supplier's name does not render it an agent of the supplier, just as every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise.**

223 F. Supp. 3d at 527-28 (emphasis added).[57] Here, the mere fact that Plaintiff later saw Matrix's name among various others on a DAC-administered VSC template provides no basis for a finding of apparent authority, especially where NAPC was simultaneously selling competitors' products like a bar selling various brands of beer.

---

[56] *See* **Ex. 16**; *see also* Mey Dep. 174:14-17 ("Q. Are you aware that NAPC sold products that were administered by companies other than [DAC] and Matrix? A. I seem to have a vague recollection of that.").

[57] *See also Worsham*, 2022 U.S. Dist. LEXIS 139580, at *22-23 (holding that "a caller's assertion that [he or she] represent[s] [putative principal] is insufficient standing alone to establish a principal-agent relationship under any applicable agency law theory.") (citing *Sing Fuels Pte*, 39 F.4th at 277)); *Worsham v. Direct Energy Servs., LLC*, Civil Case No. SAG-20-00193, 2021 U.S. Dist. LEXIS 46837, at *18 (D. Md. Mar. 12, 2021) (holding that "the fact that callers said they were 'calling on behalf of Direct Energy, and, in one instance, provided 'Direct Energy's customer service number,' does not establish agency relationship."); *McCurley v. Royal Seas Cruises, Inc.*, No. 21-55099, 2022 U.S. App. LEXIS 9079, at *5 (9th Cir. Apr. 5, 2022) (affirming a finding of no apparent authority where "[t]here is no basis to find that the person answering . . . would reasonably believe that [the purported agent] was acting on behalf of Royal Seas before the point of transfer.").

Accordingly, there is no issue of material fact regarding the absence of an agency relationship through apparent authority that could subject Matrix to liability here.[58]

### c)  There is no factual dispute that Matrix did not ratify any unlawful conduct.

There is no dispute that Matrix did not ratify any unlawful conduct of NAPC because Matrix did not have knowledge of or approve of NAPC's actions at issue here, and received no benefit from it. "A party 'may ratify an act by failing to object to it or to repudiate it,' . . . or by 'receiving or retaining [the] benefits it generates[.]'" *Hodgin*, 885 F.3d at 252 (quoting Restatement (Third) of Agency § 4.01 cmt. f., g.). "However, a party 'is not bound by a ratification made without knowledge of material facts involved in the original act when the [party] was unaware of such lack of knowledge.'" *Id.* (quoting Restatement (Third) of Agency § 4.06)). Furthermore, in the context of alleging vicarious liability through ratification, "the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Monitronics*, 223 F. Supp. 3d at 525 (internal citation omitted). When, as here, the plaintiff fails to present "evidence that would support that an applicable principal-agent relationship existed between [purported agent] and [purported principal]" the purported principal cannot be found to have ratified "the actions of its resellers or authorized dealers." *Id.* at 525-26.

As established above, no agency relationship existed between NAPC and Matrix. Thus, the requisite agency relationship required to even consider ratification is missing; ratification is unavailable as a matter of law. Regardless, the record also reflects that at all relevant times, Matrix

---

[58] *See* **Ex. 3** at 4-6 (showing that Plaintiff's listed "evidence" of the Matrix Defendants' vicarious liability consists largely of self-serving interpretations of the Producer Agreement); *see Adey v. Pension Benefit Guar. Corp.*, Civil Action No. 5:07CV18, 2008 U.S. Dist. LEXIS 86743, at *11 (N.D. W.Va. Oct. 24, 2008) ("[When] the essential question is one of the interpretation of the contract's language, [it is] a question of law clearly within the competence of courts[.]" (quoting *Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494, 497-98 (4th Cir. 1997))).

did not know about Plaintiff's call with NAPC, or that NAPC had engaged in any unlawful conduct in connection with that call.[59] Simply put, Matrix could not ratify conduct it had no control over and no knowledge of. Indeed, even DAC has no record of this specimen VSC Plaintiff claims to have purchased momentarily. Therefore, it was impossible for Matrix to be able to ratify NAPC's allegedly unlawful calls, and it did not.[60]

The record is also undisputed that Matrix also received no benefit whatsoever from NAPC's interactions with Plaintiff; her momentary purchase of a policy resulted in a full refund of her brief down payment, such that there was no purported benefit for Matrix to even retain here.[61] Again, neither Matrix nor DAC were even aware of NAPC's call or sale to Plaintiff until this lawsuit.[62] In short, *none* of the elements of ratification are present here.

Based on this record—when the alleged unlawful calls were made without the knowledge or acquiescence of the party in question—the Fourth Circuit has confirmed that summary judgment in favor of the Defendant is proper.[63]

---

[59] *See* Matrix Dep. at 84:11-86:5 (Matrix testifying to its lack of knowledge of the call to Plaintiff and related purchase); *id.* at 54:18-55:4 (Matrix testifying to its lack of knowledge of NAPC engaging in unlawful calling practices prior to 2019).

[60] *See Black*, 2022 U.S. Dist. LEXIS 165799, at *12 ("If all SunPath knew or should have known was that it was accepting a sale—not that it was accepting a sale obtained through an unlawful call—it could not ratify the underlying unlawful act.").

[61] *See* **Ex. 11**; *see also* Mey Dep. at 180:12-15 ("Q. Ms. Mey, do you have any evidence that either of the Matrix defendants benefited in any way from your purchase of the policy on April 27, 2017? A. No.").

[62] *See* Matrix Dep. at 84:11-86:5 ("Q. Do you believe [Plaintiff] was sold the [VSC] that is Exhibit 5? . . . A. I don't know if I'm in a position to say because it's not something that [Matrix] produced or had access to. [Matrix wasn't] aware of it until it was brought up in this suit" and addressing that Matrix has no record of the purchase and it is not in Matrix's system); *see also* **Ex. 12** (DAC's list of DAC-administers VSCs sold by NAPC fails to show any sale to Plaintiff).

[63] *See Hodgin*, 885 F.3d at 253 (affirming summary judgment to TCPA defendants where Plaintiffs failed to "cite any evidence showing that [the defendants] knew that the [purported agents' sales] were fueled by robocalls and calls to the Do-Not-Call-Registry[.]"); *see also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) (granting summary judgment where alleged unlawful calls were made "without the knowledge or acquiescence" of defendant).

The undisputed factual record shows that Matrix is not vicariously liable for any alleged violation of the TCPA by NAPC pursuant to any theory of actual authority, apparent authority, or ratification. Accordingly, for Count I, the Court should grant summary judgment in favor of the Matrix Defendants and dismiss Plaintiff's claims against them with prejudice.

### B.  Matrix Financial is Entitled to Summary Judgment on Counts I and II.

Matrix Financial is entitled to summary judgment on Counts I and II because Plaintiff has no evidence of any connection between Matrix Financial and the Spring 2017 calls at issue. This is unsurprising: Matrix Financial did not even exist when the calls at issue occurred. *See* **Ex. 6**. Matrix Financial was not formed until July 2017 to later serve a role in Matrix-administered VSCs, which it is undisputed Plaintiff never purchased from NAPC. Obviously, a nonexistent entity did not control NAPC or ratify NAPC's allegedly unlawful conduct. Predictably, Matrix Financial is not a party to either the Producer Agreement between NAPC and Matrix, or the agreement between DAC and Matrix, both from 2016. *See* **Ex. 13**; *see also* **Ex. 15**. Plaintiff never even deposed Matrix Financial. Matrix Financial can have no liability for acts that occurred before its existence. Summary judgment must be granted to Matrix Financial.

### C.  Plaintiff's DNC Claims Fails Because She Never Made a DNC Request to NAPC.

Plaintiff's Count II is for alleged violations of 47 U.S.C. § 227(c). This part of the TCPA provides a private right of action to "[a] person who has received <u>more than one</u> [telemarketing] telephone call within any 12-month period by or on behalf of the same entity[,]" if that person's residential telephone number was listed on the National Do-Not-Call Registry. *Id*. Such "[c]alls may not be actionable if a seller has an established business relationship ('EBR') with a person,

which is created after an individual makes a purchase, inquiry, or application for products or services and lasts for a certain number of months." *Vance v. DIRECTV, LLC*, Civil Action No. 5:17-cv-179, 2022 U.S. Dist. LEXIS 140518, at *8 (N.D. W.Va. Aug. 1, 2022) (citing 47 U.S.C. § 227(a)(2), (4); 47 C.F.R. § 64.1200(c)(2), (f)(5)). When an EBR is formed by a person's transaction with a company, the EBR lasts for 18 months from the date of purchase. *See* 47 C.F.R. § 64.1200(f)(5). An EBR can be terminated by a seller-specific do-not-call request, but not by the mere "termination of an underlying commercial relationship." *Rowan v. US Dealer Servs.*, Civ. No. 21-09945 (KM)(LDW), 2022 U.S. Dist. LEXIS 127153, at *11 (D. N.J. July 18, 2022), *appeal dismissed*, No. 22-2522 (3d Cir. Nov. 21, 2022) (holding that "the termination of an underlying commercial relationship is not sufficient to terminate an EBR and cut off the otherwise-applicable eighteen-month deadline for calls.").

If it is assumed, as Plaintiff claims, that the four 2017 calls were all made by or on behalf of NAPC, then Plaintiff has no claim under 47 U.S.C. § 227(c). Plaintiff claims she purchased a VSC from NAPC on Call 1. Even if that call violated Section 227(c), Plaintiff's purchase of the VSC from NAPC created an EBR between Plaintiff and NAPC, rendering Calls 2-4 not actionable under 227(c). *Id*. While Plaintiff did cancel the VSC she purchased on Call 1, her cancellation request did not contain a do-not-call request. *See* **Ex. 10** at MEY000096 (Plaintiff's email stating "I changed by mind. I don't want the policy. Can you cancel please."). Plaintiff's cancellation of the VSC did not terminate the EBR between Plaintiff and NAPC. *See Rowan*, 2022 U.S. Dist. LEXIS 127153, at *11. Since NAPC cannot be held liable for Plaintiff's Count II, it follows that Matrix also cannot not be held liable, even if NAPC was found to be its agent.[64]

---

[64] *See Green v. Cosby*, 138 F. Supp. 3d 114, 138 (D. Mass. 2015) ("[A] principal's vicarious liability turns on whether the agent is liable." (quoting Restatement (Third) of Agency 7.03 cmt. b); *see also J&J Sports Prods. v. Nacipucha*, 17-CV-1186-AMD-SJB, 2018 U.S. Dist. LEXIS 85083, at *16 (E.D.N.Y. May 18,

Plaintiff's Count II also fails because 47 U.S.C. § 227(c) does not apply to wireless lines, the very types of lines at issue here.[65] The Matrix Defendants are entitled to summary judgment on Plaintiff's 47 U.S.C. § 227(c) claim.

## IV.   CONCLUSION

For the foregoing reasons, the Matrix Defendants respectfully request that the Court grant their Motion for Summary Judgment and enter judgment in their favor against Plaintiff.

---

2018) ("In the absence of agent liability . . . none can attach to the principal." (quoting *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999))).

[65] *See Gaker v. Q3M Insurance Solutions*, 3:22-cv-00296 (W.D.N.C. Feb. 8, 2023) (ECF No. 28) (dismissing plaintiff's 47 U.S.C. § 227(c) claim due to that statute only applying to residential lines and plaintiff failing to include such an allegation); *see also In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling, DA-23-62, ¶ 23 n.56 (2023) (FCC recognizing that a cellular telephone line is not a residential telephone line, "[w]e note that a number assigned to a wireless service is not a "residential telephone line" under section 64.1200 of our rules. *Compare* 47 CFR § 64.1200(a)(1)-(2) *with* 47 CFR § 64.1200(a)(3)."); *see also* **Ex. 4** at 6 (confirming Plaintiff received the calls at issue on wireless lines).

Dated: February 24, 2023                    **MATRIX DEFENDANTS**

                                                                        By Counsel

/s/ *Kristen Andrews Wilson*
Gordon H. Copland (WV Bar No. 828)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
T: (304) 933-8162
F: (304) 933-8601
gordon.copland@steptoe-johnson.com

Kristen Andrews Wilson (WV Bar No.11342)
STEPTOE & JOHNSON PLLC
1233 Main Street, Ste. 3000
P.O. Box 751
Wheeling, WV 26003-075
T: (304) 231-0444
F: (304) 233-0014
kristen.andrews-wilson@steptoe-johnson.com

and

Joseph P. Bowser, *Pro Hac Vice*
(VA State Bar No. 88399)
ROTH JACKSON GIBBONS CONDLIN, PLC
1519 Summit Avenue, Suite 102
Richmond, VA 23230
T: 804-441-8701
F: 804-441-8438
jbowser@rothjackson.com

## CERTIFICATE OF SERVICE

I certify that on this 24th day of February, 2023, I caused a copy of the Memorandum in Support of the Matrix Defendants' Motion for Summary Judgment to be filed through the Court's electronic filing system. Notice of this filling will be sent by operation of the Court's electronic filing system to all parties listed below.

Brion B. Doyle,
Varnum LLP
P.O. Box 352
Grand Rapids, MI 49501
616-336-6479
Email: bbdoyle@varnumlaw.com

Kaitlyn N. McKitrick
Bowles Rice LLP
501 Avery Street
P O Box 49
Parkersburg, WV 26102
(304) 420-5591
Fax: (304) 420-5587
Email: kmckitrick@bowlesrice.com

Patrick R. Hanes
Williams Mullen
200 South 10th Street
Suite 1600
Richmond, VA 23219
804-420-6455
phanes@williamsmullen.com

*Attorneys for SING for Service, LLC*

Andrew C. Robey
Ryan McCune Donovan
Hissam Forman Donovan Ritchie PLLC
707 Virginia Street, East Suite 260
Post Office Box 3983
Charleston, WV 25301
Email: arobey@hfdrlaw.com
           rdonovan@hfdrlaw.com

*Attorneys for Plaintiff*

Joseph P. Bowser, *Pro Hac Vice*
(VA State Bar/Federal Bar No. 88399)
ROTH JACKSON GIBBONS CONDLIN, PLC
1519 Summit Avenue, Suite 102
Richmond, VA 23230
T: 804-441-8701
F: 804-441-8438
jbowser@rothjackson.com

*Co-Counsel for Matrix Defendants*

*/s/ Kristen Andrews Wilson*
Kristen Andrews Wilson