IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**DIANA MEY,** on behalf of
herself and a class of others
similarly situated,

        Plaintiff,

v.                           **CIVIL ACTION NO. 5:21-CV-62**
                                   Judge Bailey

**MATRIX WARRANTY SOLUTIONS,
INC., et al.,**

        Defendants.

## ORDER GRANTING MOTION TO CERTIFY CLASS

Pending before this Court is plaintiff's Motion for Class Certification [Doc. 153] and accompanying Memorandum in Support [Doc. 154]. The Matrix defendants filed a Response in Opposition to Plaintiff's Motion for Class Certification [Doc. 175] on March 14, 2023. Plaintiff filed a Reply in Support of Motion for Class Certification [Doc. 187] on March 21, 2023. Accordingly, this matter is ripe for adjudication. For the reasons contained herein, this Court will grant the Motion and certify a class.

## BACKGROUND

Matrix Warranty Solutions and Matrix Financial Services ("the Matrix defendants") sell and administer vehicle service contracts. In this litigation, plaintiff alleges that the Matrix defendants–through one of their telemarketing vendors, National Auto Protection Corp. ("NAPC")–knowingly engaged in a pattern and practice of flooding consumer phones with illegal prerecorded messages in violation of the Telephone Consumer Protection Act ("TCPA"). See [Doc. 1]. On April 27, 2017, plaintiff received a telephone call from

(682) 267-1875. *See* [Doc. 153-1]. When plaintiff answered the telephone call, she heard a prerecorded message. *See* [Doc. 153-2]. After several automated prompts, the telephone call forwarded plaintiff to a live agent who purportedly solicited a vehicle service contract. [Id.]. When asked, the telemarketing agent represented her employment with NAPC. [Id.]. In an effort to confirm the origins of the telephone call, plaintiff purchased a vehicle service contract and authorized the agent to charge her credit card. [Id.]. Plaintiff made an initial payment to enroll her vehicle, with the remainder of the premium broken into periodic payments. [Id.]. The terms of the payment plan were provided and agreed to over the phone and, having confirmed the purchase and financing, the telephone call ended. [Id.].

Following the telephone call, plaintiff's credit card was charged by "National Auto Protection." [Doc. 153-3]. Plaintiff also received a welcome email from NAPC's Meredith Ball, which confirmed the purchase of an "Element EP" vehicle service contract. [Doc. 153-4]. The representative provided plaintiff with a hyperlink, which allowed her to view the terms and conditions of the vehicle service contract. [Id.]. The policy plaintiff received was stamped with the Matrix defendants' logo and titled "Element EP" protection plan, which the Matrix defendants confirmed is a Matrix product. *See* [Doc. 153-6 at 89:24–90:2]. Among other instructions, policy holders, like plaintiff, were directed to "report the repairs to the Administrator at 1-855-500-MATRIX (6287)," and the bottom of each policy page was stamped with the following instruction:

> AUTHORIZATION MUST BE OBTAINED FROM THE ADMINISTRATOR BEFORE STARTING ANY TEARDOWN OR REPAIRS. PLEASE CALL 1-855-500-MATRIX (6287) FOR AUTHORIZATION AND INSTRUCTIONS.

2

[Doc. 153-5]. At the time of the call in question, the Matrix defendants were responsible for creating, hosting, and administering the automated menu associated with the aforementioned telephone number. [Doc. 153-6 at 72:16–19, 73:5–24].

Having identified the source of the subject telephone call, plaintiff cancelled the vehicle service contract later that same day. [Doc. 1]. On April 29, 2017, plaintiff's credit card was refunded by "NATNL AUTO PRTECT CORP." [Doc. 153-3]. Debyi Adams, a customer service manager with NAPC, confirmed the cancellation via email. [Doc. 153-7].

At the time of the subject telephone call, NAPC acted as a "licensed call center" and "authorized sales representative" of the Matrix defendants. *See* [Doc. 153-8]. A Direct Marketing Producer Agreement, dated June 2016, governed the parties' relationship and authorized NAPC to offer and sell the Matrix defendants' vehicle protection plans, including the "Element EP" plan sold to plaintiff in April 2017. *See* [Doc. 153-9 at 4–5].

## PROPOSED CLASS

From this backdrop, plaintiff moves, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), for certification of the following class:

> Prerecord Class. Plaintiff and all persons appearing on the Customer Lists (a) to whom NAPC sold a Matrix-administered, -created, or -branded product; (b) by initiating a telephone call to a residential and/or cellular telephone number; (c) using artificial or prerecorded voice messages; and (d) at any time four years before the date this action was commenced through the date of class certification.

*See* [Doc. 154 at 4–5].

3

## **PROPOSED CLASS THEORY AND RELATED RECORDS**

Plaintiff claims to have identified each individual who purchased a Matrix defendants' vehicle service contract from NAPC during the relevant class period, April 24, 2017, to present. Customer List 1, [Doc. 153-10], purportedly represents all customers who purchased a vehicle service contract from NAPC during the period April 17 to August 31, 2017. Customer List 2, [Doc. 153-11], purportedly represents all customers who purchased a vehicle service contract from NAPC during the Period August 31, 2017, through present. Customer Lists 1 and 2 ("the Customer Lists") identify each of the approximately 10,375 individuals who purchased products from NAPC during the class period.

Because the vehicle service contracts are generally financed over the life of the policy, nearly all of the individuals on the Customer Lists executed payment plan agreements. The payment plan agreements contain notations from NAPC representatives indicating that the customer provided assent "per phone" and indicate the date of the call. *See* [Doc. 153-12]. Plaintiff claims to be in possession of payment plan agreements for nearly all of the 10,375 prospective class members. In each instance, the date of the call coincides with the date of the purchase, both of which are reflected on the Customer Lists and the corresponding payment plan agreement. By matching each customer on the Customer Lists to a corresponding payment plan agreement, plaintiff claims she can demonstrate that each customer received a phone call from NAPC, as evidenced by the "per phone" notation.

Furthermore, the prerecorded calls that plaintiff received, as well as her subsequent purchase and interactions with the Matrix defendants and their agents, appear to be well documented. Plaintiff's inference that NAPC used prerecorded messages across the entire class is further bolstered by sworn statements plaintiff obtained from prospective class members who recalled receiving a prerecorded message in conjunction with the purchase of their policy from the Matrix defendants. *See* [Docs. 153-13, 153-14, 153-15, 153-16 & 153-17].

## APPLICABLE LAW

### A.   The TCPA

In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy" and that Americans were "outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." Pub. L. No. 102-243, §§ 2(5)–(6) (1991), *codified at* 47 U.S.C. § 227. Perhaps the most well-known aspect of the TCPA was the creation of the Do-Not-Call Registry, which was established in 2003 to provide a safe haven from unwanted telemarketing calls. By adding a telephone number to the Registry, a consumer indicates his or her desire not to receive telephone solicitations. *See* 47 C.F.R. § 64.1200(c)(2). The TCPA and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2); 16 C.F.R. § 310.4(b)(iii)(B) ("It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to

5

. . . initat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.").

The TCPA creates a private right of action for injunctive and monetary relief for any "person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of the [TCPA] regulations." 47 U.S.C. § 227(c)(5). Calls may not be actionable if a seller has an established business relationship ("EBR") with a person, which is created after an individual makes a purchase, inquiry, or application for products or services and lasts for a certain number of months. See 47 U.S.C. § 227(a)(2), (4); 47 C.F.R. § 64.1200(c)(2), (f)(5).

The prohibitions against telemarketing to consumers who have listed their personal and non-business numbers on the Registry extends both to the entities that physically dial the illegal call and those entities that benefit from such calls. As recognized by the Federal Communications Commission ("FCC"), the federal agency empowered by Congress to implement and interpret the TCPA, because allowing an entity "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions," a corporation or other entity "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." ***In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules***, 28 FCC Rcd. 6574, 6574 (2013) ("May 2013 FCC Ruling").

As the Fourth Circuit recognized in **Krakauer v. Dish Network, L.L.C.**, the TCPA's "simple and administrable" provisions, the "obvious attempt [by Congress] to vindicate the public interest" through the statute's private enforcement provisions, and the overarching congressional intent "to allow consumers to bring their claims at modest personal expense" all combine to "make TCPA claims amenable to class action resolution." 925 F.3d 643, 663 (4th Cir. 2019).

### B. Class Certification

"A district court 'has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23.'" **Lienhart v. Dryvit Sys., Inc.**, 255 F.3d 138, 146 (4th Cir. 2001) (quoting **In re American Med. Sys., Inc.**, 75 F.3d 1069, 1079 (6th Cir. 1996)). "[P]laintiffs bear the burden . . . of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden . . . ." **Thorn v. Jefferson-Pilot Ins. Co.**, 445 F.3d 311, 317 (4th Cir. 2006) (quoting **Gariety v. Grant Thornton, LLP**, 368 F.3d 356, 370 (4th Cir. 2004)).

In an action such as this, class certification may be granted only if the plaintiffs satisfy the requirements of numerosity, commonality, typicality, representativeness,

predominance, and superiority of Rule 23(a)[1] and (b)(3)[2] are met. **Lienhart**, 255 F.3d at 146.

"[N]umerosity requires that a class be so large that 'joinder of all members is impracticable.' Fed.R.Civ.P. 23(a)(1). Commonality requires that 'there are questions of law or fact common to the class.' Fed.R.Civ.P. 23(a)(2). The common questions must be dispositive and over-shadow other issues." **Id**. (citing **Stott v. Haworth**, 916 F.2d 134, 145

---

[1] Rule 23(a) provides:

**(a) Prerequisites**. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1)  the class is so numerous that joinder of all members is impracticable;
(2)  there are questions of law or fact common to the class;
(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)  the representative parties will fairly and adequately protect the interests of the class.

[2] Rule 23(b)(3) provides:

**(b) Types of Class Actions**. A class action may be maintained if Rule 23(a) is satisfied and if:
(3)  the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
(A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

(4th Cir. 1990)). "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions.'" *Id.*, at n.4 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997)).

"Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.' *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982) (internal quotation marks omitted). Representativeness requires that the class representatives 'will fairly and adequately protect the interests of the class.' Fed.R.Civ.P. 23(a)(4). . . . [T]he final three requirements of Rule 23(a) 'tend to merge, with commonality and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."' *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 337 (4th Cir. 1998) (quoting *Falcon,* 457 U.S. at 157 n. 13)." *Id.* at 146–47.

"Apart from the enumerated requirements, 'Rule 23 contains an implicit threshold requirement that the members of a proposed class be "readily identifiable."'" *Krakauer v. Dish Network, L.L.C.*. 925 F.3d 643, 654–55 (4th Cir. 2019) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Under this principle, sometimes called "ascertainability," "a class cannot be certified unless a court can readily identify the class

members in reference to objective criteria." ***EQT Prod. Co.***, 764 F.3d 347, 358 (4th Cir. 2014).

"In contrast to actions under Rule 23(b)(1) and (b)(2), Rule 23(b)(3) actions are '[f]ramed for situations in which class-action treatment is not clearly called for,' but 'may nevertheless be convenient and desirable.' ***Amchem Prods., Inc. v. Windsor,*** 521 U.S. 591, 615 (1997) (internal quotation marks omitted). In addition to the four Rule 23(a) requirements, Rule 23(b)(3) actions such as this one must meet two requirements: predominance and superiority. Predominance requires that '[common] questions of law or fact ... predominate over any questions affecting only individual members.' Fed.R.Civ.P. 23(b)(3). The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' ***Amchem,*** 521 U.S. at 623. Superiority requires that a class action be 'superior to other methods for the fair and efficient adjudication of the controversy.' Fed.R.Civ.P. 23(b)(3)." ***Id***. at 147.

These questions present common legal issues which are susceptible to class action treatment. Trial courts have great discretion to conduct and manage litigation in an efficient and equitable manner. Manual for Comp. Litig., at Introduction,10.13 (4th ed. 2005). Particularly in the context of a class action, Rule 23 "allows district courts to devise imaginative solutions to problems created by... [determining] individual damages issues." ***Carnegie v. Household Int'l, Inc.***, 376 F.3d 656, 661 (7th Cir. 2004); *see also* ***In re Scientific Atlantic Inc., Sec. Litig.,*** 571 F.Supp.2d 1315, 1343 (N.D. Ga. 2007) (quoting ***Carnegie*** for this proposition and certifying class upon finding, "even if the Court ultimately concludes that aggregate damages models are not sufficiently reliable for use in this case,

the Court is convinced that other viable alternatives exist to address any individual damages issues that may arise."). Accepted methods of assessing the individual issues relating to class members include:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id*. (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)).

## DISCUSSION

This Court will certify a class, as the Fourth Circuit has emphasized that the class vehicle is the overwhelmingly superior method for resolving claims under the TCPA. *See* **Krakauer v. Dish Network, L.L.C.**, 925 F.3d 643, 663 (4th Cir. 2019).

### I. The Class is Ascertainable

In an effort to defeat certification, the Matrix defendants argue plaintiff cannot identify absent class members by reference to objective criteria. However, this Court agrees with plaintiff in that these inquiries might be proven through uniform class-wide evidence. Whether an absent class member purchased a Matrix defendants' product from NAPC may be evidenced by the Customer Lists. Whether an absent class member received a phone call from NAPC may be evidenced by the payment plan agreements,

11

which contain a "per phone" notation. Whether that call was placed during the class period may be evidenced by the payment plan agreements, which indicate the date of the "per phone" notation. Whether a call used a prerecorded message may be evidenced by the common experiences of plaintiff and other similarly-situated class witnesses. To be sure, the Matrix defendants' arguments against ascertainability in this regard seem more to focus on the seminal merits question of whether this evidence is sufficient to establish plaintiff's case in chief. To the Matrix defendants' credit, a jury may well review the evidence offered in support of the aforementioned inquiries and reject plaintiff's claims–however, sufficiency of the merits arguments like these do little to dissuade this Court's ascertainability analysis for purposes of class certification.

Similarly, the Matrix defendants argue that plaintiff has failed to provide an administratively feasible method for identifying class members. This argument, however, is based on a seeming mischaracterization of the role of plaintiff's expert, Ms. Verkhovskaya. More specifically, Ms. Verkhovskaya was instructed to identify a method by which this Court can identify members that have payment plan agreements with a "per phone" notation. Accordingly, Ms. Verkhovskaya detailed the manner in which she can programmatically identify each payment plan agreement containing a "per phone" notation while filtering out customers with inoperable phone numbers, duplicate entries, and other disqualifying attributes. Contrary to the Matrix defendants' arguments, Ms. Verkhovskaya does not appear to have been hired to opine on the meaning of the "per phone" notation–rather, she was asked to identify potential class members who fit within these analytical metrics. Whether the "per phone" notation actually indicates an outbound

prerecorded message from NAPC will ultimately be decided by the jury, and such factual inquiry does not preclude this Court from ascertaining a class.

Furthermore, the Matrix defendants claim that plaintiff cannot establish ascertainability because plaintiff's expert methodology does not identify plaintiff as a class member. This Court is not persuaded by this argument against ascertainability because Ms. Verkhovskaya's methodology is limited to identifying absent class members. The Matrix defendants cite three cases in support of this argument, wherein class certification was denied because the proposed methodology failed to properly identify the plaintiff as a class member. Those cases are readily distinguishable. For example, in *Sandoe*, proposed methodology for identifying subscribers associated with telephone numbers on call logs failed to properly associate the class representative with his own telephone number. See *Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 8 D. Mass. 2019). Unlike this case, the particular methodological failure in *Sandoe* was illustrative of a problem that would be encountered across the class as a whole unlike here, where the expert methodology is utilized for absent class member identification only.

The Matrix defendants also argue that specific call records are necessary to ascertain and certify a class. This Court disagrees, because the payment plan agreements obviate the need for specific call records. Here, the payment plan agreements contain names, addresses, and phone numbers for each call recipients. As such, the payment plan agreements allow this Court to identify class members with fairly accurate and efficient ease.[3] Thus, the ascertainability prong is satisfied here.

---

[3]The Matrix defendants argue that plaintiff's failure to obtain call records was the result of "derelict prosecution." This Court need not reach that question, though, because

## II. The Class is Numerous

Because there is no bright line test for determining numerosity, the determination rests on this Court's practical judgment in light of the particular facts of the case. *See* ***Vance v. DirecTV, LLC***, 2022 WL 3044653, at *6 (N.D. W.Va. Aug. 1, 2022) (Bailey, J.). As evidenced by the Customer Lists, the proposed class contained approximately 10,376 persons residing throughout the United States of America. Because joinder of approximately 10,376 class members is patently impracticable, the numerosity prong is satisfied.

## III. Common Questions of Law and Fact are Throughout the Class

Demonstrating class commonality is a low hurdle. ***Williams v. Mohawk Indus., Inc.***, 568 F.3d 1350, 1356 (11th Cir. 2009). The class claims must "depend upon a common contention capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." ***Wal-Mart Stores, Inc. v. Dukes***, 564 U.S. 338, 350 (2011) (cleaned up). Commonality requires only a single issue common to the class. *Id*. at 359.

The Matrix defendants' arguments notwithstanding, each putative class member here suffered, allegedly, the same injury. The common questions of law and fact include: (1) whether NAPC made unsolicited calls using artificial or prerecorded messages; (2)

---

this Court would still ultimately decline to adopt a bright line rule that class certification under the TCPA necessarily requires call records. To do so would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct. *See* ***Birchmeier v. Caribbean Cruise Line, Inc.***, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (providing that defendant's failure to retain consent records does not immunize defendants from class certification).

whether the violations were willful or negligent; and (3) whether the Matrix defendants are vicariously liable for calls placed by NAPC. See **Mey v. Venture Data, LLC**, 2017 WL 10398569, at *8 (N.D. W.Va. June 6, 2017) (identifying similar common issues). These common questions are dispositive to the class claims, apply equally to all class members, and can be potentially resolved using uniform proof and legal analysis. Because these common questions permeate the class, the commonality prong is satisfied.

### IV. The Claims Amongst the Class are Typical

"A sufficient nexus is established to show typicality if the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory." **Vance**, 2022 WL 3044653, at *6 (cleaned up). "A plaintiff's claim may differ factually and still be typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. So long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied." **Id.**, at *7 (cleaned up).

Here, plaintiff and the putative class members are alleged to have suffered the same injury–they all alleged to have received a prerecorded message by or on behalf of the Matrix defendants in contravention of the TCPA. This common injury arises from the same alleged practice and course of conduct. The Matrix defendants' arguments notwithstanding, there do not appear to be any meaningful differences between plaintiff's claims and those of the class. Accordingly, the typicality prong is satisfied.

## V. Plaintiff and Her Attorneys Adequately Represent the Class

The adequacy determination requires a two-pronged inquiry: (1) the named plaintiff must not have interests antagonistic to those of the class; and (2) the named plaintiff's attorneys must be qualified, experienced and generally able to conduct the litigation. *Vance*, 2022 WL 3044653, at *7.

As to the first prong, plaintiff's interests do not appear to conflict with those of other class members. Instead, all seek a determination that the Matrix defendants, through their agent NAPC, violated the TCPA, and all seek the same remedy.

Next, the applicable rules provide that "a court that certifies a class must appoint class counsel" and instruct this Court to consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Here, plaintiff's counsel has experience litigating TCPA and other consumer class actions in state and federal courts, and it appears they have worked diligently to prosecute the class claims in this case. Because both plaintiff and her counsel appear committed to the prosecution of this case and because there are no conflicts that would otherwise hinder representation, the adequacy prong is satisfied.

## VI. Questions of Law and Fact Common to All Class Members Predominate over Questions Pertaining to Individual Members

The predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation. See *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Implicit in the satisfaction of the predominance test

is the notion that the adjudication of common issues will help achieve judicial economy. The predominance requirement necessarily focuses on the quality of common issues rather than just the quantity. ***Gunnells v. Healthplan Servs. Inc.***, 348 F.3d 417, 429 (4th Cir. 2003).

This Court agrees with plaintiff in that this case presents two overarching, dispositive questions: (1) whether NAPC called each of the class members using prerecorded messages; and (2) whether the Matrix defendants are vicariously liable for calls placed by NAPC. Each of these questions can be addressed through common, classwide evidence. Accordingly, the predominance prong is satisfied.

## VII.   Class Certification is Superior

There are four, non-exhaustive factors relevant to this inquiry: (1) the interests of the members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D). As this Court has previously recognized, these factors are simply guidelines to help determine the benefits of a proposed class action. ***Vance***, 2022 WL 3044653, at *9. It has appeared to this Court that class certification in this type of litigation is overwhelmingly superior, and that observation remains true here. Accordingly, the superiority prong is satisfied.

## **CONCLUSION**

For the reasons contained herein, plaintiff's Motion for Class Certification **[Doc. 153]** is **GRANTED**, and this Court hereby certifies the following class:

<u>Prerecord Class.</u> Plaintiff and all persons appearing on the Customer Lists (a) to whom NAPC sold a Matrix-administered, -created, or -branded product; (b) by initiating a telephone call to a residential and/or cellular telephone number; (c) using artificial or prerecorded voice messages; and (d) at any time four years before the date this action was commenced through the date of class certification.

Furthermore, this Court hereby appoints Diana Mey as the class representative, and appoints the following attorneys as class counsel: Ryan M. Donovan, Esq., and Andrew C. Robey, Esq.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** March 23, 2023.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE